**PARFI HOLDING AB, Gunnar Gillberg, Plenteous Corp. and Grandsen, Ltd., Plaintiffs,**

v.

**MIRROR IMAGE INTERNET, INC., Xcelera.Com, Inc., Alexander M. Vik, Gustav Vik and Hans Magnus Fajerson, Defendants.**

Civ. A. No. 18507.

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 6, 2001.
Decided: Dec. 20, 2001.

Melanie K. Sharp, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; M. Frederick Pritzker and James W. Stoll, of Brown, Rudnick, Freed & Gesmer, Boston, Massachusetts, of counsel, for Plaintiffs.

Alan J. Stone and William M. Lafferty, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Sarah Chapin Columbia and John R. Baraniak, Jr., of Choate, Hall & Stewart, Boston, Massachusetts, of counsel, for Defendant Mirror Image Internet, Inc.

Jesse A. Finkelstein and Thad J. Bracegirdle, of Richards, Layton & Finger; Peter J. Macdonald and Robin L. Alperstein, of Hale and Dorr, New York City, of counsel, for Defendants Xcelera Inc., Alexander M. Vik and Hans Magnus Fajerson.

## OPINION

STRINE, Vice Chancellor.

Plaintiffs, minority shareholders of defendant Mirror Image Internet, Inc. ("Mirror Image"), have brought an action challenging a series of transactions (the "Challenged Transactions") involving defendants Mirror Image, its majority shareholder, Xcelera.com, Inc. ("Xcelera"), and three individuals who serve on the board of directors of both Xcelera and Mirror Image (the "Director Defendants"). In addition to asserting a litany of claims based upon each Transaction, plaintiffs

have argued that the sum total of the claims demonstrate a coherent strategy and "course of conduct" by defendants to illegally and fraudulently dilute the plaintiffs' ownership interests in Mirror Image.

Specifically, the plaintiffs allege that the Director Defendants—who comprised a majority of the Mirror Image board—caused Mirror Image to issue stock to Xcelera at below fair market value, and did not permit the minority stockholders to participate in those subscriptions. As a result, Xcelera increased its control of Mirror Image at an unfair cost. Once Xcelera had consolidated its ownership and diluted the minority, plaintiffs contend, the Director Defendants caused Mirror Image to engage in other transactions to benefit Xcelera at the expense of Mirror Image.

Basing their claims in part upon this alleged scheme, plaintiffs have asserted twelve individual claims against various combinations of defendants—including counts of breach of fiduciary duty, fraud, civil conspiracy, breach of contract, and interference with contract. Further, three counts of constructive fraud and a count for misappropriation of corporate opportunity have been asserted as derivative claims.

In response, defendants (in various combinations) have launched a voluminous multi-pronged assault on plaintiffs' allegations in the form of three concurrent motions to dismiss.[1] In this opinion, I address each of these defendants' motions. In so doing, I hereby:

(1) Grant summary judgment on the defendants' motion to dismiss the complaint because all the counts are subject to a mandatory arbitration provision;

(2) In the alternative:

(a) Deny Xcelera's motion to dismiss all counts against it for lack of personal jurisdiction;

(b) Deny Mirror Image's motion to dismiss plaintiffs' derivative claims (Counts IV, IX, XIV, and XV) for failure to meet the requirements of Delaware Court of Chancery Rule 23.1;

(c) Grant all defendants' motions to dismiss the fraud claims (Counts III, VIII, and XIII) as well as the claims against the Director Defendants for aiding and abetting such fraud (within Counts III, VIII, and XIII), for failure to state a claim upon which relief may be granted under Delaware Court of Chancery Rule 12(b)(6);

(d) Require that the complaint be amended to change the derivative constructive fraud claims (Counts IV, IX, and XIV) into counts for breach of fiduciary duty;

(e) Grant the defendants' motions to dismiss the civil conspiracy claims against all defendants (Counts V and X); and

(f) Grant the defendants' motion to dismiss plaintiffs' breach of contract claim against Xcelera (Count XI), as well as their motion to dismiss plaintiffs' tortious interference with contract claim against the Director Defendants (Count XII).

## I. *The Parties* [2]

Plaintiff Parfi Holding, AB ("Parfi"), a Swedish corporation, is the successor-in-

---

**1.** That is, separate briefs were filed by each of Xcelera and the Director Defendants, Xcelera, and Mirror Image.

**2.** For the most part, the facts in this opinion are all drawn from the complaint or the numerous exhibits thereto. All reasonable inferences are drawn in favor of the plaintiffs. In

interest to Mirror Image AB ("Mirror AB"), now known as Drax Holding AB. During the events which gave rise to this litigation, Mirror AB was the parent corporation of Mirror Image. Parfi is a corporation formed to represent the stockholders of Mirror AB in pursuing relief against Xcelera and the Director Defendants. Parfi thus stands in the shoes of Mirror AB for purposes of this litigation.

The other Mirror Image minority shareholders alleging harm are plaintiffs Plenteous Corp. ("Plenteous"), a Panamanian corporation; Grandsen, Ltd. ("Grandsen"), a company based in and formed under the laws of Great Britain; and Gunnar Gillberg, a natural person and citizen of Sweden. Each of these plaintiffs has participated with Parfi in pressing these claims and certain claims in arbitration; indeed, Grandsen and Gillberg are party to a formal contract with Parfi to share in the costs and benefits of litigation.[3] For that reason and reasons of verbal economy, I hereafter refer to the plaintiffs as Parfi, except where a more precise distinction is necessary.

Defendant Xcelera.com, Inc., formerly "The Scandinavia Company" and now known simply as "Xcelera Inc.," is a holding company incorporated and with a principal place of business in the Cayman Islands, British West Indies. Xcelera became the majority shareholder of Mirror Image in 1999. At the time of the events giving rise to this dispute, Xcelera's principal asset was its controlling stake in the Delaware corporation, Mirror Image.[4]

Defendant Mirror Image, a Delaware corporation with a principal place of business in Massachusetts, is an Internet infrastructure company that has developed technology to speed access to popular Web sites. Mirror Image was formed as a Delaware subsidiary of Sweden-based Mirror AB in May 1997.

Defendants Alexander M. Vik, his brother Gustav M. Vik, and Hans Magnus Fajerson (collectively, the aforementioned "Director Defendants") have been, at all relevant times, members of the boards of both Xcelera and Mirror Image.[5] It is alleged that the Vik brothers own Xcelera through Vik Brothers International.

## II. Factual Background

### A. Xcelera Obtains a Controlling Interest In Mirror Image Through the Underwriting Agreement

In May 1997, Mirror AB incorporated Mirror Image in Delaware. Headed by Sverker Lindbo, who served as Mirror Image's president and chief executive officer, the Massachusetts-based subsidiary was engaged in developing technology to speed access to information on the Internet. Mirror Image's original certificate of incorporation authorized 16,000 shares of common stock; at its inception, however, only 1,000 shares were issued. They were all held by Mirror AB.

In its formative years, Mirror Image struggled to gain access to capital. By January 1999, despite repeated infusions

---

Section II(A), I treat the defendants' motion as one for summary judgment and rely on other evidence, which I have also construed in the plaintiffs' favor.

**3.** See, e.g., Dep. of Sverker Lindbo at 60.

**4.** At one point, Xcelera also owned a resort hotel in the Canary Islands, Spain.

**5.** According to the complaint, Sverker Lindbo and Tryggwe Karlsten also served on Mirror Image's board of directors at certain times relevant to this action. Lindbo was the founder, president, and CEO of Mirror AB, and, as discussed next, also served as president and CEO of Mirror Image. Neither of these individuals is a party to this action.

from Mirror AB totaling $10 million, Mirror Image was unable even to meet its short-term obligations. Indeed, in order to cover the company's immediate payroll needs, certain of the Mirror AB shareholders agreed to lend $75,000 to Mirror Image in early 1999.

In March 1999, in a further effort to fund its short-term operations, Mirror AB entered into an agreement (the "Underwriting Agreement" or "Agreement") with Xcelera and Plenteous to raise $2 million. That money, ostensibly, would keep Mirror Image afloat until June; in the meantime, Mirror Image was supposed to develop a business plan to solicit new financing by the time that $2 million ran out.

Under the Agreement, Mirror Image issued 3,876 new shares at $516 per share. The lion's share of the $2 million investment, $1.75 million, came from Xcelera. In return, Xcelera became the controlling shareholder of Mirror Image, and was guaranteed *at least* 2,626 of Mirror Image's 5,167 shares once the entire subscription was funded.[6] In addition, Xcelera and Plenteous were granted the right to appoint four directors to the Mirror Image board. Mirror AB was expressly given the right to appoint one director.[7] Xcelera and Plenteous appointed Alexander Vik, Gustav Vik, Fajerson, and Tryggwe Karlsten. Mirror AB appointed Lindbo, who remained president and CEO.

In addition, in language that would prove portentous in the disputes to come, the Agreement provided that any dispute, controversy or claim *"arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration"* in Sweden.[8]

The Underwriting Agreement was consummated on March 29, 1999. Because its various terms and the ownership interests it created are rather confusing, it makes sense at this stage to summarize the Agreement's terms. They are as follows:

- Xcelera received 3,392 shares for its $1.75 million investment. Plenteous, which invested $250,000, received 484 shares.

- Under § 7.3 of the Agreement, certain individuals with large ownership interests in Mirror AB were given an opportunity to purchase Mirror Image shares. It is under this provision that plaintiffs Gillberg and Grandsen, Ltd. entered the picture; Gillberg subscribed to 100 shares, while Grandsen purchased 41. Under § 7.3, these shares—up to 875 of them—would be issued *pro rata* from Xcelera's and Plenteous's shares of the subscription (*e.g.*, in a seven-eighths to one-eighth ratio, respectively). As it turned out, options were only exercised on 185 of these 875 shares.

- The $75,000 loan by the Mirror AB shareholders to Mirror Image was converted into 291 shares of Mirror Image stock.

- The subscription was divided into three phases. First, at the closing of the Agreement on March 29, Xcelera and Plenteous were issued one-half of their allotted shares (1,696 and 242, respectively). Second, between March 29 and April 16, the major Mirror AB shareholders were given the opportunity to subscribe pursuant to § 7.3. Finally, after April 16, the remaining shares would be issued.

---

**6.** Underwriting Agreement, § 7.3.

**7.** *Id.* § 4.2(b)(i). Mirror AB's right to appoint one board member was contingent upon Xcel-

era and Plenteous collectively owning a majority of Mirror Image's issued shares.

**8.** *Id.* § 20.2 (emphasis added).

- Once the terms of the Agreement were fully implemented, the relative shareholder interests were as follows:

| Interest In Mirror Image | Number of Shares |
|---|---|
| (1) Options to Purchase Mirror Image Shares Exercised by Mirror AB Shareholders (Including Gillberg and Grandsen, Ltd.) | 185 |
| (2) Shares to Xcelera (minus 162 shares from (1), above) | 3,230 |
| (3) Shares to Plenteous (minus 23 shares from (1), above) | 461 |
| (4) Shares to Mirror AB Shareholders Pursuant to the $75,000 Loan | 291 |
| (5) Original Shares Held By Mirror AB | 1,000 |
| **Total Number Of Mirror Image Shares** | **5,167** |

B. *The April 23 Special Shareholders' Meeting and April Subscription*

Once Xcelera had control of the Mirror Image board and held a majority of its stock, Xcelera began to reap almost immediate benefits from its investment. Namely, Xcelera's own shares increased in price from $4 per share to over $26 per share in the month following the closing of the Underwriting Agreement.[9] The complaint indicates that Xcelera was not content to own a mere majority of Mirror Image, but quickly set out to use its newly acquired majority control to dilute the other Mirror Image stockholders even further. The first step, Parfi contends, was to put the wheels in motion for another subscription.

On April 13, 1999, company secretary Steven Peri sent notice to holders of record for a special shareholders meeting, to be held on April 23, 1999. Despite knowing that a subscription would be voted upon at the meeting, the Vik brothers and Fajerson assertedly misled Lindbo into believing that the meeting was only to discuss generally Mirror Image's "future capitalization needs."[10] In turn, Lindbo apparently passed on this vague rationale to Peri, whose notice to stockholders unwittingly cast the purpose of the meeting in misleadingly vague terms. The goal of this vagueness, asserts Parfi, was to lull minority shareholders into not exercising their right to block the meeting by preventing a quorum.[11]

At any rate, the special shareholders' meeting was convened on April 23, 1999. A quorum was present.[12] Gustav Vik made a presentation asserting the need to raise additional capital, then unveiled a resolution to raise an additional $4 million for Mirror Image. Under the plan (the "April Subscription"), Mirror Image would issue an additional 7,752 shares at $516 per share. Though all minority shareholders present voted against the Subscription, the proposal was approved on the strength of Xcelera's majority.

Parfi asserts that Xcelera proposed and voted for the April Subscription on terms that were "unfair, unreasonable, unnecessary, and improper."[13] In particular, it alleges that:

- The Subscription price was below fair market value.

- The Subscription was so vague in its terms that it "failed to identify all

9. Compl. ¶ 33.

10. *Id.* ¶ 44.

11. The Mirror Image by-laws require a 70% quorum for shareholder action.

12. As of the record date, only a portion of the shares created under the Underwriting Agreement had been issued. Thus, the stockholders at that time were as follows: Xcelera, 1,696 shares; Mirror AB, 1,000 shares; Peri & Stewart, trustee for the Mirror AB shareholders whose loan was converted to Mirror Image stock, 291 shares; Plenteous Corp., 242 shares (not present). Compl. ¶ 37.

13. *Id.* ¶ 58.

shareholders who were entitled to subscribe to additional shares." [14]

- Demand for additional information regarding the April Subscription was purportedly refused.
- The harsh deadlines imposed by the Resolution made it practically impossible for minority shareholders to participate.
- Given, among other things, Xcelera's then-substantial market capitalization,[15] there was no legitimate business reason to raise additional capital for Mirror Image, an entity controlled by Xcelera. Plaintiffs suggest that the Director Defendants' flat assertion of the need for additional capital, without explanation or documentation, was mere cover for Xcelera's desire to dilute the minority shareholders.

In spite of the purported defects in the execution of the April Subscription, certain minority stockholders attempted to exercise their right to subscribe on April 30, 1999—subject to their review of a Management Business Plan that was supposed to be forthcoming. This exercise was never recognized, and Xcelera subscribed to all 7,752 shares, increasing its ownership in Mirror Image to 86%. The relative ownership interest of the minority shareholders fell to 14%.

Meanwhile, back on April 19, Alexander Vik demanded the resignation of Lindbo as president of Mirror Image. The following day, Alexander Vik convened a board meeting at which Parfi asserts that he fraudulently reported Lindbo wished to resign from the board. Lindbo was supposed-ly never notified of the meeting, nor did he ever express his desire to resign from the board. Allegedly based on the defendants' malfeasance, Lindbo did eventually resign as CEO, but not director, in May 1999.

### C. *The July Subscription and Stock Splits*

The Director Defendants initiated yet another subscription in July, 1999 (the "July Subscription"). Allegedly without providing the minority stockholders with any information showing the necessity of further capital—or even showing whether the previous subscriptions had been fully funded—Gustav Vik, now Mirror Image's secretary, called a shareholders' meeting at which a $3 million subscription was proposed and adopted. Under this July Subscription, an additional 5,814 shares of common stock were to be issued, again at $516 per share.

Mirror Image issued all 5,814 shares to Xcelera. Parfi's claims regarding the July Subscription are similar to those under the April Subscription, namely, that the stock was issued at significantly below market value;[16] that the minority shareholders were not given adequate time to decide whether to subscribe; and that Xcelera itself did not meet the payment schedule it was imposing on other shareholders. In addition, Parfi claims that because of a "first come, first served" provision in the July Subscription, the entire Transaction was a sham—that is, two days before the offer, Xcelera had already subscribed to all the shares allotted under the plan. Further, Parfi contends that the July Sub-

---

14. *Id.* ¶ 50.

15. At that time, Xcelera's market capitalization had reached $100 million as a result of a dizzying rise in its stock price. *Id.* ¶ 32.

16. Parfi bases this allegation on the fact that Xcelera stock was trading at $29 per share as

of July 21, 1999. In turn, it posits that since Xcelera's principal asset was its 86% ownership interest in Mirror Image, it must be true that "the value of the Mirror Image shares greatly exceeded the $516 per share assigned value." *Id.* ¶ 69.

scription placed the number of issued and outstanding shares at 16,980—in excess of Mirror Image's authorized capital of 16,000 shares.

On September 3, 1999, Mirror Image filed an amendment to its certificate of incorporation in the office of the Delaware Secretary of State authorizing (albeit belatedly) the additional shares under the July Subscription. This amendment would be one of two such amendments filed in the Secretary of State's office pursuant to the Subscriptions. Once the July Subscription was completed, Xcelera had increased its ownership interest in Mirror Image to 91.8%.

Meanwhile, back on July 23, 1999, the Mirror Image board of directors had authorized a 2,000–for–1 stock split, increasing the authorized shares in Mirror Image from 16,000 to 32 million. Shortly thereafter, the board announced an additional 3–for–1 split, further increasing the authorized shares in the company to 96 million. The $516–per–share value set in the April and July Subscriptions translated to a post-split price of $0.09 per share.

Parfi further alleges that at the time Xcelera subscribed to the July Subscription at that price, it also issued stock options to employees with a post-split exercise price of $0.78 per share. It contends this $0.78–per–share price is an accurate indicator of the true value of Mirror Image stock, and uses it as evidence to suggest that July Subscription shares were sold to Xcelera at only a small fraction of their true value.[17]

### D. The November 1999 Convertible Preferred Stock Offering

In the months that followed, Mirror Image was presented with enticing opportuni-

ties in the booming technology market. According to Parfi, Xcelera used its control of Mirror Image to divert those opportunities to itself, and to further dilute the minority stockholders.

In the fall of 1999, Alexander Vik was in the process of negotiating a strategic alliance for Mirror Image with Hewlett–Packard—negotiations that were not publicly disclosed. The plan was to exchange equity in Mirror Image for hardware and other infrastructure to allow Mirror Image to better deliver Internet service to its customers. Such a strategic alliance would, of course, appear to the financial markets to be an endorsement of Mirror Image by a "major player." In addition, Parfi alleges that Alexander Vik knew that a leading financial analyst was preparing a favorable report on Mirror Image technology.

Supposedly with the knowledge and belief that Xcelera's shares would rise upon eventual disclosure of this good news, the Director Defendants authorized a private placement of newly created Convertible Preferred Stock on November 30, 1999 (the "Convertible Preferred Stock Offering" or "Offering"). Allegedly, the deal was structured so that only Xcelera could participate—and so that Xcelera would not have to pay for its new shares until the pending strategic alliance was completed and publicly announced.[18]

Under the Offering, 23.5 million shares of new Series A preferred stock were released by Mirror Image to Xcelera at a post-split price of $2.13 per share. The Series A holders could, at their option, convert one Series A share for three

---

**17.** *See id.* ¶ 72.

**18.** That is, under the Offering, 25% of the cost of the new shares came due on December 31, 1999, which was purportedly enough time for

Vik to close and announce the strategic alliance. The remaining 75% came due on March 31, 2000. *Id.* ¶ 73.

shares of Mirror Image common stock, thus resulting in an implied common stock value of $0.71 per post-split share. To pave the way for the Offering, Mirror Image filed a second amendment to its certificate of incorporation in the office of the Delaware Secretary of State.

On December 21, 1999, Mirror Image announced publicly that Hewlett–Packard would make a $32 million investment in the company. Within two days of that announcement, Xcelera's stock price—presumably in recognition of its control over Mirror Image—soared from $67 per share to $160 per share.[19] Around this time, Xcelera allegedly paid the initial $8 million due under the Offering.

The good times continued to roll. In February 2000, with Xcelera stock hovering at around $130 per share, technology industry analyst George Gilder published his report touting Mirror Image's technology. By February 17, Xcelera's stock was trading at $190 per share. Parfi alleges that around this time, Xcelera used the proceeds from the Hewlett–Packard investment to meet its financial obligations to purchase the Convertible Shares issued to it under the Offering.[20]

Parfi contends that there was no legitimate business reason for the Convertible Preferred Stock Offering, and suggests that its sole purpose was to financially benefit Xcelera. It also alleges that the effective common stock per-share price of $0.71 was again significantly less than fair market value.

### E. *The Exodus Transaction*

The final Transaction in contest here occurred on March 22, 2000. On that date, Xcelera announced that it had forged a substantial deal with Exodus Communications, Inc. ("Exodus") whereby Exodus agreed to purchase 32,725,872 Mirror Image shares for a total value of $637.5 million, consisting of $75 million in cash and 3,758,268 shares of Exodus stock.

Parfi alleges that by its actions, Xcelera misappropriated the corporate opportunity belonging to Mirror Image. To wit, under the terms of the deal, only 25% of the cash and stock value from the Exodus deal was paid directly to Mirror Image. The remaining 75%, Parfi claims, was paid directly to Xcelera in exchange for Mirror Image shares "owned" by Xcelera. It further asserts that there was no legitimate business purpose for structuring the transaction in this way, other than to improperly benefit Xcelera at Mirror Image's expense by allowing Xcelera to sell equity it had recently bought too cheaply from Mirror Image to Exodus for an enormous profit.

### II. *Legal Analysis*

Parfi has asserted myriad claims based upon the Challenged Transactions. Counts I–V of the complaint arise out of the April Subscription; the first two counts assert breaches of fiduciary duty against Xcelera (Count I) and the Director Defendants (Count II). Count III alleges fraud against all defendants, and further claims that the Director Defendants aided and abetted such fraud. Count IV, a derivative claim, asserts constructive fraud

---

19. This assumption by Parfi further demonstrates its general approach to valuing Mirror Image stock for purposes of its complaint. Under the assumption that Xcelera's control of Mirror Image was Xcelera's principal if not singular asset, Parfi "pegged" the value of the Mirror Image shares to the Xcelera stock.

20. While not pled with much precision in its complaint, Parfi presumably alleges that the increase in Xcelera's share price resulting from the Hewlett–Packard announcement provided Xcelera with the wherewithal it needed to meet its purchase obligations under the Offering.

against all defendants, and also asserts an aiding and abetting claim against the Director Defendants. Count V alleges civil conspiracy against all defendants. Counts VI–X arise in connection with the July Subscription, and track the allegations of Counts I–V.[21]

Counts XI–XIV arise out of the November, 1999 Convertible Preferred Stock Offering. Parfi asserts that there existed an implied contract between Xcelera and the minority stockholders that all Mirror Image stock offerings would be made available to all shareholders on identical terms, and that Xcelera breached that contract (Count XI) by precluding the minority stockholders from participating in the Offering. Count XII alleges that the Director Defendants tortiously interfered with that implied contract. Count XIII asserts a fraud claim against all defendants in connection with the Offering, and further alleges that the Director Defendants aided and abetted the fraud perpetrated by Xcelera. Count XIV is a derivative claim for constructive fraud against all defendants.

Count XV, a derivative claim, arises out of the Exodus Transaction. It alleges that all defendants misappropriated the Exodus opportunity for Xcelera to the detriment of Mirror Image.

Defendants, upon various grounds, have moved to dismiss all the counts. I now address each of the defendants' arguments.

### A. Because the Challenged Transactions Are Arbitrable, The Complaint Must Be Dismissed In Its Entirety

The defendants first argue that this entire matter must be dismissed because all of Parfi's claims fall within the scope of the arbitration clause in the Underwriting Agreement. That clause is broadly written and states that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination or invalidity thereof shall be settled by arbitration in accordance with the Rules of the Arbitration Institute of Stockholm Chamber of Commerce."[22]

The record relating to this aspect of the pending motions is voluminous and complicated. The following recitation attempts to boil down the pertinent undisputed facts, which largely come from exhibits all parties have relied upon as forming the basis for their arguments.[23] Despite the fact that the Underwriting Agreement is by its own terms governed by the substantive law of Sweden, all parties have argued this aspect of this motion under the assumption that Delaware law governs the question of whether Parfi's claims are arbitrable. The parties have not presented any argument that the Underwriting Agreement would not be interpreted in accordance with its plain terms under Swedish law. In keeping with the parties'

---

**21.** In the complaint, Parfi's heading for Count IX alleges fraud. In the paragraph describing the allegation (¶ 152), however, it states that defendants "committed constructive fraud against Mirror Image." This statement, coupled with the facts that (1) Parfi already alleged fraud in Count VIII in connection with the July Subscription, and (2) Parfi asserted Count IX as a derivative complaint, lead me to conclude that Parfi meant to assert a "constructive fraud" claim in Count IX.

**22.** Underwriting Agreement, § 20.2.

**23.** I treat this motion as one for summary judgment, and will decide it on the basis of the undisputed facts arising from the exhibits submitted by the parties. Parfi and the defendants have both submitted portions of the arbitration record in support of their respective positions, and I can perceive no prejudice to considering the unambiguous aspects of these documents, given the parties' mutual consent and reliance upon them.

choice, I therefore apply the settled principles of Delaware law to determine whether Parfi's claims are arbitrable. If those claims are arbitrable, this case must be dismissed because Delaware law respects and enforces agreements to arbitrate.[24] Indeed, our law requires that doubts about the scope of an arbitration clause be resolved in favor of arbitration.[25]

In accordance with the arbitration clause, Parfi and Plenteous brought claims against Xcelera in Sweden alleging that Xcelera had breached the Underwriting Agreement and fraudulently induced the consummation of that Agreement. On September 26, 2001, the arbitration panel issued its decision, finding that Xcelera had breached its contractual obligations to Plenteous, but not to Parfi. A central part of that panel's ruling was that Plenteous had been assured that Mirror Image would not take corporate action without Plenteous's assent, and that Xcelera had caused Mirror Image to take action without Plenteous's approval in breach of that assur-

ance. One of the actions Xcelera was found to have caused Mirror Image to take without Plenteous's consent was the April Subscription.

As important, Parfi alleged in the arbitration that the parties to the Underwriting Agreement understood that the initial investment of Xcelera under that contract would be sufficient to fund Mirror Image for a period of months, and that during those months Mirror Image would prepare a business plan and seek outside venture capital funding.[26] Parfi further argued that it entered the Underwriting Agreement on the understanding that Xcelera would not use its majority control of Mirror Image to dilute the other stockholders. Consistent with this contention, Parfi asserted that the actions of Xcelera in effecting the April and July Subscriptions, the Convertible Preferred Stock Offering, and the Exodus Transaction breached its contractual expectations under the Underwriting Agreement.[27] Indeed, Parfi argued

---

24. *SBC Interactive, Inc. v. Corporate Media Partners*, Del.Supr., 714 A.2d 758, 761 (1998); *Elf Atochem N. Am., Inc. v. Jaffari*, Del.Supr., 727 A.2d 286, 295 (1999).

25. *SBC Interactive*, 714 A.2d at 761.

26. Parfi argued the following:

> Should the Underwriting Agreement not be deemed invalid, it may be noted that the ownership balance stated in the Underwriting Agreement represented the balance under which the parties would co-operate to work against a more permanent venture capital financing of MII Inc. **Each party was entitled to keep his percentage, as regards ownership of MII Inc, until a more permanent venture capital financing was raised from outside. By disturbing this ownership balance without consent from the other parties, the Respondent committed a breach of contract that has rendered the Respondent liable to pay damages to the Claimants.**
> Arb. Award at 11 (bold emphasis added).

27. The record of Parfi's argument to the arbitration panel is replete with references to the fact that the Challenged Transactions breached its expectations under the Underwriting Agreement and/or were unfair. Under a section of the Arbitral Award entitled "Legal Arguments," the tribunal noted that Parfi had argued the following:

> It was deciding factors [sic] underlying the decision by the Claimants to execute the Underwriting Agreement: (i) *that* the Respondent had the intention to, and would indeed, act in accordance with the purposes underlying the Underwriting Agreement; *i.e.,* that the parties thereto would provide financing only as an interim solution that would enable Mirror Inc to complete a business plan that would be used to raise additional venture capital *at* more favorable valuations; ... (iv) *that* **the Respondent did not have the intention to, and would not indeed, use its future position as majority shareholder for purposes of diluting the percentage of shares owned by the Claimants, who would become minority share-**

that the Challenged Transactions were an integral part of a secret and pre-conceived plan by Xcelera to seize control of Mirror Image for itself, to dilute out the other stockholders, and extract the value of the corporation for itself.[28] The Underwriting Agreement was a critical and necessary step in putting Xcelera in a position to carry out this concealed plan, but the Challenged Transactions were the actual vehicle by which Xcelera benefited itself at the expense of the other stockholders in breach of its contractual obligations.[29]

> holders of Mirror Inc, and for purposes of enforcing measures to such a diluting effect; (v) that the Respondent had the intention to, and would indeed, act in good faith as regards the economic interests of the minority shareholders;
>
> * * *
>
> Contrary to the deciding assumptions thus underlying the decision by the Claimants to execute the Underwriting Agreement, the respondent never had any of the intentions assumed by the Claimants and never behaved as assumed by the Claimants. At the time of the execution of the Underwriting Agreement, it was apparent for the Respondent that it did not have any of the intentions that were assumed by the Claimants, and that the Respondent would not comply with the future behaviour that was assumed by the Claimants. All the deciding assumptions, which were held by the Claimants, were thus incorrect (Sw."orikoga") at the time when the Underwriting Agreement was signed... **It is obvious that the Claimants would not have entered into the Underwriting Agreement, should they have known that the deciding assumptions were in fact wrong or should they have known that the deciding assumptions would fail.**

Arb. Award at 7–8 (bold emphasis added). With respect to the putative unfairness of the Challenged Transactions, note, for example, the following testimony of Sverker Lindbo in the arbitration proceeding:

> Q: When the Underwriting Agreement was entered into, did Mirror AB assume that Xcelera did not intend to use its future position as a majority shareholder for purposes of diluting the minority shareholders...?
>
> A: Yes.
>
> Q: Can you explain why this is something very important to Mirror AB?
>
> A: Well, we had been through a tough negotiation and we felt that this was sort of the big hit that we took, but from now on we would share in the value creation that was going to happen, and therefore we relied on... fair treatment by... the new majority.
>
> Q: Were these assumptions erroneous or incorrect in any way?
>
> A: As it turned out, yes.

Defs. Op. Sup. Br. In Further Sup. of Mot. To Dismiss, Ex. K.

28. Parfi asserted as much in its Closing Statement to the Arbitrators. Then, it argued that:

> The main and outstanding question is if the Respondent intended to dilute the minority shareholders as a course of action when the Underwriting Agreement was executed, or if the Respondent intended to retain for itself the option as a course of action to dilute the minority shareholders, and thus if there was a scheme at the execution of the Underwriting Agreement to unfairly dilute the minority shareholders by means of the detour plan.

Joint Status Report Regarding Arbitration, Tab 14.

29. The Arbitral Award again provides specific references to this argument. In the section of the Arbitral Award entitled "Liability," for example, the panel noted that Parfi had asserted the following:

> Each of the Claimants has suffered considerable damage, which has been caused by several main factors. *First,* the damages were made possible by the execution of the Underwriting Agreement that entitled the Respondent to a majority holding of shares in MII [I]nc ... *Fifth,* **the damages were caused by the initiation of corporate action between Mirror Inc and the Respondent, and by all the relevant decisions made by the Respondent as controlling shareholder of MII [I]nc. Sixth, the damages were caused by the Respondent's subsequent subscription of shares, and the therein-inherent dilution of the Claimant's ownership percentage.** All these main factors contributed to the Claimants' damages, which consists of the economic loss pertaining to a significantly decreased percentage

At the arbitration, Parfi presented evidence regarding all of those Transactions and their effect on the minority stockholders of Mirror Image.[30] But because it had also filed suit here, Parfi simultaneously told the arbitration panel that it was not seeking to arbitrate the question of whether the April and July Subscriptions, the Convertible Preferred Stock Offering, and Exodus Transaction involved breaches of fiduciary duty under Delaware law by Xcelera, except insofar as Xcelera's alleged improprieties in effecting those Transactions bore on its breach of contract and fraudulent inducement claims.

Parfi's advocacy strategy appears to have persuaded the arbitration panel to avoid making any findings regarding whether the Challenged Transactions involved breaches of fiduciary duty under Delaware law. Thus, the panel stated:

> The Claimants have . . . not based their case in the present arbitration on or presented evidence regarding Delaware

law. Also, they have not invoked the duties and obligations of Xcelera as majority shareholder towards the minority in MII Inc. *They have also not asked the Tribunal to consider the legal effects of the corporate actions in MII Inc. after the Underwriting Agreement* (including the disputed share issues in April and July 1999 to which the Tribunal will revert in the following) *except insofar as such actions may have relevance for the validity of the Underwriting Agreement or give rise to damages for breach of the Underwriting Agreement and undertakings ancillary thereto.*[31]

In keeping with this statement, Parfi argues that the claims it has asserted in this case regarding the Challenged Transactions do not fall within the scope of the arbitration clause. Two primary contentions buttress Parfi's position: (1) that the claims pending in this action are not dependent on the validity or invalidity of the Underwriting Agreement, but arise solely out of the duties Xcelera and the Director

> as to each Claimants' ownership of shares in MII [I]nc.
>
> * * *
>
> **Should the Underwriting Agreement not be deemed invalid, and should strict liability not be deemed at hand, it is apparent that the promises given to Claimants on 22 March and 29 March 1999 were part of the Underwriting Agreement as an undertaking by the Respondent.** In such a case, it may be noted that the promises were given prior to the execution of the Underwriting Agreement—and this that the formal requirements for addends to the Underwriting Agreement were not in force at this particular time—and that all parties to the Underwriting Agreement obviously intended the *promises to form part of the Underwriting Agreement.* **The Respondent however neglected to comply with these promises, and committed this breach of contract by wilful misconduct and with the intent to cause said damages to the Claimants.**
> Arb. Award at 10–11 (bold emphasis added; italics in original). In addition, with respect to the Hewlett–Packard and Exodus transac-

tions in particular, the tribunal noted Parfi's argument that

> Without legitimate business reasons Hewlett–Packard and Exodus Communication Inc. have subsequently been allowed to invest in MII Inc. and further dilute the minority shareholders. In its dealings with Exodus Communication Inc. Respondent structured the investment so as to retain for itself most of the investment and thereby leaving MII Inc. with only a small part of the badly needed new capital.

*Id.* at 6.

30. As the defendants have pointed out in a side-by-side comparison of Parfi's arbitration demand and its complaint in this case, the factual overlap between the arguments presented to the Swedish arbitration panel and this court is extensive. *See* Ex. C of Op. Br. of Xcelera and Director Defendants' Mot. to Dismiss. It is far, far harder to find factual contentions that do not overlap than it is to identify those made in both forums.

31. Arb. Award at 25 (emphasis added).

Defendants owed as a matter of the law of fiduciary duty; and (2) that Parfi did not voluntarily submit the claims pending in this action to arbitration.

■ The problem with Parfi's position is that it ignores the plain language of the arbitration clause. That language does not solely require the arbitration of claims that the Underwriting Agreement was breached or was invalid. The first phrase of the clause, which requires arbitration of claims "arising out of" the Agreement, would seem to cover direct claims for breach of the Agreement or fraud in the inducement. But the drafters of the clause were not content to cover only those claims arising directly under the contract. *Instead, they went on to draft additional language requiring the arbitration of claims "connected" not only to the Underwriting Agreement, but more broadly to the "breach" or the "invalidity" of that Agreement.* The language is, as the defendants argue, quite expansive in scope.[32]

The clause is therefore most logically read as requiring Parfi to arbitrate any claims connected to any alleged breach of the Underwriting Agreement. By its own words in the arbitration proceeding, Parfi has again and again set forth its view that the Challenged Transactions constituted a breach of the Underwriting Agreement, and were evidence of Xcelera's fraudulent intent at the time the Underwriting Agreement was consummated. The word "connection" means, among other things, a "[r]eference or relation to something else ...".[33] As used in the arbitration clause,

the term is most sensibly read as requiring the arbitration of any claims connected (or related) to conduct asserted to be a breach of the Underwriting Agreement or conduct that forms the basis for a claim that the Agreement is invalid.[34] That is, it should be understood as an expression of the parties' desire to have disputes connected to claims that the Underwriting Agreement was invalid or breached arbitrated simultaneously with those claims.

Here, Parfi itself has "connected" its claims in this case to an alleged breach of or invalidity of the Underwriting Agreement. The Challenged Transactions are alleged to have caused the contractual damages that Parfi assertedly suffered and that Parfi sought to recover in the arbitration. Xcelera's conduct in effecting those Transactions was argued to be a breach of the Agreement's implied term that the minority stockholders would not be diluted.

Despite facing pending arguments in this court that its claims here were arbitrable, Parfi itself was unable to "disconnect" its contract claims from the claims pled in this case. It arguments to the arbitrators are replete with references to the Challenged Transactions, which were at the heart of its claims for contractual damages.

Recognizing this vulnerability, Parfi encourages me to read the "in connection with" language in the arbitration clause as only applying to non-contract claims that have legal elements that overlap breach of contract or fraudulent inducement claims, regardless if the non-contract claims ad-

---

**32.** *See Elf Atochem,* 727 A.2d at 294–95 (construing "in connection with" language in an arbitration clause broadly).

**33.** THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 390 (4th ed.2000).

**34.** I conclude so for a reason that is obvious upon closer examination. The arbitrability of a non-contract claim cannot sensibly depend on whether the claim is connected to an actual "breach" of or the actual "invalidity" of the Agreement, because the conclusion as to whether a breach occurred or whether the Agreement is invalid will come only after the arbitration hearing.

dress the identical factual conduct as the contract or inducement claims. That is, Parfi argues that its claims in this case are not arbitrable, because they can be proven without the need to prove a breach of the Underwriting Agreement or the invalidity of that Agreement. As noted, the difficulty with this argument is that if the parties to the Underwriting Agreement sought to draft a clause requiring only the arbitration of those claims that have as an element a breach of the Agreement, they could have done so. Instead, they chose the much broader term "in connection with" and used it in a manner that is much more plausibly read as requiring a party to arbitrate any claims connected to conduct that is contended to be a breach of the Agreement.

The commercial good sense of the defendants' reading is more apparent as well. Under their reading, the Agreement requires the resolution of claims related to a common set of underlying facts in a single forum, thus resulting in the efficient use of the parties' litigative resources. By contrast, Parfi's reading encourages the inefficient processing of claims related to identical conduct in different forums. Parfi's reading is also suspect because it leaves little, if any, meaning to the broad "in connection with" language. If other claims based on the same conduct that is also alleged to be a breach of, or the cause of the invalidity of, the Agreement are not "in connection with" a breach or the invalidity of the Agreement, what non-contract claims against a party to the Agreement

are so "connected"?[35] For all these reasons, I conclude that the claims asserted in this action are arbitrable.

■ I therefore reach the separate argument advanced on behalf of plaintiffs Gunnar Gillberg and Grandsen, Ltd., who argue that they are not bound by the arbitration clause because they are not formal signatories to the Underwriting Agreement. I also reject that argument. Gillberg and Grandsen are Mirror AB stockholders who are parties to a joint prosecution agreement with Parfi and stood to gain from any recovery in the arbitration.[36] Parfi, it will be recalled, is the corporate successor to Mirror AB, which was formed as a litigation construct to help its stockholders, including Gillberg and Grandsen, secure relief against Xcelera and the Director Defendants. Gillberg and Grandsen are therefore operating in concert with Parfi and have availed themselves of the benefits of the Underwriting Agreement's arbitration clause.

That Gillberg and Grandsen are not strangers to the Underwriting Agreement is also demonstrated by the fact that they obtained and exercised the opportunity to buy the individual Mirror Image shares they hold under § 7.3 of that Agreement. This right was accorded to them by virtue of their status as Mirror AB stockholders.[37] Given these facts, Gillberg and Grandsen have embraced the Agreement as if they were intended, third-party beneficiaries of that Agreement and cannot now disavow the responsibilities that come with that status.[38]

**35.** A tortious interference with contract claim would be so connected, but would typically involve a claim against someone not a party to the Agreement.

**36.** Lindbo Dep. at 60.

**37.** Section 7.3 of the Agreement provides that holders of more than 100,000 shares of Mirror AB stock could purchase one share of

Mirror Image for every 8,000 shares of Mirror AB they owned. As noted above, Gillberg purchased 100 shares and Grandsen purchased 41 shares of Mirror Image pursuant to that section.

**38.** *See Westendorf v. Gateway 2000, Inc.,* Del. Ch., C.A. No. 16913, 2000 WL 307369, at *4, Steele, V.C. (Mar. 16, 2000) (when donee ben-

I confess that the result I reach is somewhat unsatisfying, and undoubtedly leaves Parfi and the other plaintiffs in a pickle. It grates a bit that well-pled claims for breach of fiduciary duty that do not depend on proof of a breach of the Underwriting Agreement would fall within the scope of the Agreement's arbitration clause. The reason this decision gnaws at me a bit may be that Parfi's claim that the Challenged Transactions were breaches of the Underwriting Agreement does not find much, if any, support in the text of that contract. But Parfi obviously believed principles of Swedish contract law gave it reason to hope for victory on that claim and its related fraud in the inducement claim. Thus, Parfi and its affiliates float in a brine of their own making, having consciously chosen the risky strategy of dividing factually connected claims.

Once Parfi itself decided that the Challenged Transactions were a breach of the Underwriting Agreement and evidence of the invalidity of that Agreement, it implicated one of the plain purposes of the arbitration clause: to require that all other claims connected to arbitrable breach of contract and fraud in the inducement claims be arbitrated as well. Parfi was the master of its own case. Had it chosen to contest the Challenged Transactions on grounds wholly unrelated to the Underwriting Agreement, then it could have avoided the fate it suffers today. But when it alleged in arbitration that the Challenged Transactions were an integral part of a deliberate plan to breach and/or fraudulently induce the Underwriting Agreement, and sought damages from Xcelera on account of those transactions, Parfi traded away its right to press its

perhaps more plausible fiduciary duty claims in this court. Having done so, Parfi has left me no choice but to dismiss its claims, and deny Parfi a second forum in which to seek damages based on the same conduct of Xcelera already examined by the arbitration panel.

My dismissal is obviously without prejudice to the arbitration of the claims, assuming the arbitration panel is willing to entertain them at this late date.

My decision that all of the counts pled in the complaint are arbitrable disposes of this case in its entirety. I could terminate this opinion at this point with the reader's gratitude. The posture of the case, however, persuades me that it is more efficient for the court and the parties for me to rule, in the alternative, on the other issues presented by the defendants' three-pronged attack on the complaint. I so conclude because of the likelihood of an appeal. To the extent that my decision on the question of arbitrability is overturned in whole or in part, a ruling at this time on the remaining issues will put the parties in the position possibly to obtain authoritative rulings from the Supreme Court on all pleading-stage issues at once, allowing them to proceed with discovery and to trial if the complaint is held on appeal to state claims that can be litigated in this court. It seems to me to risk much waste—in the form of delay and the need for the parties and the court to re-examine subjects now in the forefront of our minds—were I to defer ruling on the multitude of other issues the parties have so furiously and laboriously contested in their many submissions. Therefore, I burden the reader with my resolution of the myriad of other questions posed to me.[39]

eficiary accepts the benefits of a contract, it must accept the responsibilities contained in the contract's arbitration clause).

**39.** If my decision on arbitrability is affirmed, the rest of my opinion becomes non-appealable *dicta,* not binding on the parties or the arbitration panel.

B. *Xcelera's 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction Is Denied Under the "Conspiracy Theory" of Personal Jurisdiction*

Xcelera contends that the complaint fails to allege sufficient facts to support the assertion of this court's jurisdiction over it. Because Xcelera is not a resident of Delaware, is not registered to do business here, and did not directly perform any act in Delaware in connection with the events pled in the complaint, it argues that this court has no statutory or constitutional authority to exercise jurisdiction over it.

 The problem with Xcelera's argument is that it ignores the reality that under 10 *Del. C.* § 3104(c), the acts of a party's agent within Delaware can be imputed to that party for personal jurisdiction purposes. The conspiracy theory of personal jurisdiction articulated in *Istituto Bancario Italiano SpA v. Hunter Engineering Co.*[40] provides one method to determine whether a non-Delaware defendant such as Xcelera has "committed acts satisfying § 3104 'through an agent.' "[41] The *Istituto* test requires a factual showing that: (1) a conspiracy existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[42]

 Here, Parfi has pled facts that, if true, satisfy this test. The complaint al-

leges that Xcelera and its representatives on the Mirror Image board purposely conceived a plan to dilute the other stockholders of Mirror Image and to secure most of the equity of Mirror Image for Xcelera at a grossly inadequate price. Xcelera's argument that there are no facts pled that indicate that Xcelera had knowledge of any such conspiracy is makeweight. The complaint contains allegations that the Vik brothers and Fajerson worked together to place large amounts of the equity of Mirror Image in Xcelera's hands through a series of self-dealing Transactions effected at an inadequate price. Xcelera's knowledge of this plan can be inferred from its participation in the Transactions, and the fact that its representatives on the Mirror Image board were the moving forces behind them.

The other elements of the *Istituto* test are satisfied because Xcelera is properly charged with responsibility for two substantial acts that occurred in Delaware in furtherance of the alleged conspiracy to injure a Delaware corporation and its minority stockholders. In September 1999, Mirror Image filed a certificate with the Secretary of State belatedly amending its certificate of incorporation to increase the company's authorized shares. Without this amendment, the earlier issuance of shares to Xcelera in the July Subscription would have violated Mirror Image's charter. Likewise, in late 1999, another certificate amendment was filed with the Secretary of State to facilitate the Convertible Preferred Stock Offering. These acts in Delaware constituted an essential step in the conspiracy and satisfy the *Istituto* test.[43] Furthermore, it is clear that Xcel-

---

**40.** Del.Supr., 449 A.2d 210 (1982).

**41.** *HMG/Courtland Properties v. Gray,* Del.Ch., 729 A.2d 300, 307 (1999).

**42.** *Istituto Bancario,* 449 A.2d at 225.

**43.** In *Istituto* itself, the filing of a certificate amendment necessary to the conspiracy was held to satisfy the test. *Id.* at 216–217.

era had reason to know of those acts because they were authorized by the Vik brothers and Fajerson, who are directors of Xcelera. Indeed, given the Vik brothers' majority control of Xcelera, the inference that Xcelera lacked knowledge of these acts is untenable.

■ Finally, the complaint sets forth facts sufficient to make the exercise of jurisdiction over Xcelera consistent with the Due Process Clause. Because it is so rigorous and focuses on the out-of-state defendant's Delaware-directed conduct, the *Istituto* test is a sound method by which to examine the constitutionality of an exercise of personal jurisdiction.[44] In this case, the test indicates that Xcelera may be sued here without unfairness. A majority stockholder who wields control of a Delaware subsidiary through a board majority and who effects self-dealing transactions with that subsidiary which require for their implementation acts in Delaware should reasonably expect to face suit here. Delaware has a substantial and legitimate interest in providing a forum for the resolution of claims that corporate fiduciaries, including majority stockholders, have breached their duties to the stockholders of a Delaware corporation.[45] Based on the pled facts, Xcelera knew that it was participating in activities that would have a profound effect, for good or ill, on a Delaware corporation, Mirror Image, and its stockholders. As such, the exercise of this court's jurisdiction over it is constitutionally permissible.

C. *Mirror Image's Motion to Dismiss the Derivative Claims Under Court of Chancery Rule 23.1 Is Denied*

Next, by separate motion, Mirror Image seeks dismissal of the four derivative claims (Counts IV, IX, XIV, and XV) for failure to satisfy the requirements of Court of Chancery Rule 23.1. The defendants argue that Parfi has failed to plead demand futility and that, as a result, the derivative claims in the complaint must be dismissed. The resolution of this issue turns on whether a majority of the Mirror Image board can disinterestedly and independently consider a demand.[46] On this motion, the answer to this question turns on a single director, Fajerson, because the defendants concede that the Viks are incapable of objectively considering a demand and because Parfi did not allege that the other members of the five-member Mirror Image board could not impartially evaluate a demand.

The question as to Fajerson is starkly posed. The only alleged fact that bears on his partiality is his status as a director of both Xcelera and Mirror Image. The complaint does not allege that Fajerson was personally interested in the Challenged Transactions, that he is a stockholder of Xcelera, or that he is a paid officer of either company or another entity controlled by the Viks.

■ For the following reasons, I conclude that Fajerson's dual directorships render him unable to impartially consider a demand. I start with first principles. Assume that Fajerson had been the only member of the Mirror Image board who also served on the Xcelera board. Even under that assumption, the Transactions challenged in the complaint would have been presumptively voidable unless one of the safe harbors set forth in 8 *Del. C.* § 144 applied. That is, under § 144, Fajerson's status as a director of another

---

44. *See HMG/Courtland,* 729 A.2d at 307.

45. *Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105, 1123–24 (1988).

46. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

"corporation ... in which one or more of [Mirror Image's] directors or officers are directors or officers" would alone be sufficient to implicate common law voidability concerns. Furthermore, § 144 makes clear that a director such as Fajerson is not considered impartial (or in the words of § 144, disinterested) for purposes of considering a transaction between the corporation (i.e., Mirror Image) and another corporation (i.e., Xcelera) which he also serves as a director. Consistent with § 144, it has also been the practice to consider directors such as Fajerson conflicted for purposes of evaluating whether a transaction is subject to the business judgment rule or entire fairness standards of review.[47] And certainly someone in Fajerson's predicament would never have been appointed to a Mirror Image "special committee of independent, disinterested directors" to consider a transaction with Xcelera.[48] Whether phrased as an interest issue (per § 144) or an independence issue (because of Fajerson's duties to an interested party), Fajerson's role as a director of Xcelera would be seen as disqualifying.

The question thus becomes whether some deviation from this logic is justified in the Rule 23.1 context. I confess to being unable to see the non-foolish inconsistency here.[49] A demand regarding the Challenged Transactions would require Fajerson to determine whether Mirror Image should bring suit against Xcelera on claims arguably worth tens of millions of dollars. This would require Fajerson to attempt to consider solely the best interests of Mirror Image, at the same time as Fajerson also owes a fiduciary duty of loyalty to act in the best interests of Xcelera. Perhaps Fajerson is the unusual person who can put such an obvious contradiction in loyalty out of his mind. But the law of demand cannot act on peculiarities of character unique to particular defendants and unknowable to plaintiffs pleading complaints; it must instead proceed on the basis of the more common inferences one draws from specific factual scenarios. The more usual and logical inference is that someone in Fajerson's position would, of course, harbor concern for Xcelera's interests in pondering a demand on Mirror Image.[50] As a result, Fajerson does not qualify as an independent director under the reasoning of our corporation law because "extraneous considerations" cloud his mind.[51]

In so concluding, I recognize that there is case law that implies that to lack independence for demand excusal purposes,

**47.** For that independent reason, the defendants' motion also lacks force. The complaint pleads particularized facts that suggest that the entire fairness standard of review—rather than the business judgement rule—would apply to the Transactions and that the Transactions might not have been fair. As a result, the complaint satisfies the second prong of *Aronson*.

**48.** For example, I doubt any lawyer would argue with a straight face that a director in Fajerson's position could serve on a special committee and have that committee be given burden-shifting effect in a case governed by *Kahn v. Lynch Communication Sys.*, Del. Supr., 638 A.2d 1110 (1994).

**49.** See RALPH W. EMERSON, *Self–Reliance*, in ESSAYS, FIRST SERIES ¶ 14 (1841).

**50.** The reasoning of cases holding that directors cannot impartially consider demands to sue close relatives supports the conclusion I reach here. *Mizel v. Connelly*, Del. Ch., C.A. No. 16638, 1999 WL 550369, at *4, Strine, V.C. (July 22, 1999 rev. Aug. 2, 1999); *Chaffin v. GNI Group, Inc.*, Del.Ch., C.A. No. 16211, 1999 WL 721569, at *5, Jacobs, V.C. (Sept. 3, 1999); *Harbor Fin. Partners v. Huizenga*, Del. Ch., 751 A.2d 879, 887 (1999).

**51.** *Aronson*, 473 A.2d at 816; *Unitrin, Inc. v. Am. Gen. Corp.*, Del.Supr., 651 A.2d 1361, 1375 (1995).

Fajerson must be alleged to have been under the domination and control of Xcelera or the Vik brothers or beholden to them in some personal, pecuniary sense. One prior case can even be read as holding that directors in precisely Fajerson's situation are deemed independent in the Rule 23.1 context.[52] But the more fundamental reasoning of the governing Supreme Court cases supports the outcome I reach. At bottom, the question of independence turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind.[53] That is, the Supreme Court cases ultimately focus on impartiality and objectivity.[54] By any common-sense application of those terms, Fajerson lacks the independence to determine whether Mirror Image should sue Xcelera, a corporation to whom he owes the strict fidelity of a fiduciary. Indeed, in that sense, Fajerson is in fact "beholden" to Xcelera.[55]

It would trivialize our concepts of director fidelity to hold that someone like Fajerson is unconflicted simply because he would have no substantial personal, financial interest at stake in the demand decision.[56] Human beings act for a variety of reasons. Thankfully, not all of those motivations are financial and people often engage in altruistic behavior.[57] I hew therefore to the optimistic belief that Fajerson could not vote to sue Xcelera without pondering his duty of loyalty to that corporation.

D. *The Defendants' Motion to Dismiss Parfi's Fraud Claims Is Granted, And Parfi Shall Restate Its Constructive Fraud Claims As Breach of Fiduciary Duty Claims*

The complaint alleges counts of breach of fiduciary duty, fraud, and constructive fraud. For all practical purposes, these claims are indistinguishable. The counts all allege that the Subscriptions and the Preferred Stock Offering involved the issuance of Mirror Image shares to Xcelera in exchange for cash consideration that Xcel-

---

**52.** *Heineman v. Datapoint Corp.*, Del.Supr., 611 A.2d 950 (1992). *Heineman* can, I suppose, be distinguished on a narrow factual ground. *Heineman* in part involved whether demand was excused because four of the eight DataPoint directors also served on the board of a corporation that received a $350,-000–a–year consulting contract challenged by the plaintiffs. In this case, the Challenged Transactions are far more important to Xcelera than the consulting contract in *Heineman* was to the consulting corporation in that case. As a result, a decision by Fajerson to sue Xcelera thus requires him to cause it much greater potential harm. This particularized factual distinction could be said to make the cases different. I confess that this difference does not satisfactorily elide the logical tension between the opinion in that case and this one.

**53.** A caveat to this, of course, is that a director is permitted to bear in mind legal and ethical constraints that confine corporate action.

**54.** *See, e.g., Brehm v. Eisner*, Del.Supr., 746 A.2d 244, 257 (2000); *Rales v. Blasband*, Del. Supr., 634 A.2d 927, 934 (1993).

**55.** THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 163 (4th ed.2000) (beholden means "[o]wing something ... to another"); THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 117 (9th ed.1995) ("under obligation").

**56.** I note that our law would not permit a Delaware lawyer to counsel a client on whether it was advisable to sue another of the lawyer's clients. *See* Del. Rules of Prof. Conduct 1.7 and 1.8 (2001).

**57.** *See generally* Margaret M. Blair & Lynn A. Stout, *Trust, Trustworthiness, And The Behavioral Foundations Of Corporate Law*, 149 U. PA. L. REV. 1735 (2001).

era and the Director Defendants knew was worth substantially less than the shares Xcelera received. The fiduciary duty counts make the obvious point that Xcelera is a majority stockholder which controlled the Mirror Image board, and that an issuance of shares to itself for grossly inadequate consideration would constitute a breach of fiduciary duty by it and by the Xcelera directors who served on the Mirror Image board and authorized the Transactions. The defendants have not moved to dismiss those fiduciary duty counts for failure to state a claim.

But the fraud and constructive fraud counts make substantively identical allegations. That is, the fraud or constructive fraud suffered by Mirror Image and its stockholders simply involves the consummation of unfair sales of stock to Xcelera.[58] Because Xcelera is a majority stockholder whose own directors constituted a majority of the Mirror Image board, it and its representatives on the Mirror Image board supposedly committed a fraud on the corporation and the minority shareholders by consciously structuring Transactions that transferred shares to Xcelera at far less than fair value.

Parfi's rationale for pleading the fraud and constructive fraud counts apparently rests in some fear that it will not be able to recover unless it can prove a level of wrongdoing amounting to fraud. This fear arises because Parfi is concerned about the applicability of 8 *Del. C.* § 152, which states in pertinent part that

The consideration ... for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine. In the absence of actual fraud in the transaction, the judgment of the directors *as to the value of such consideration* shall be conclusive.[59]

■ This fear is, however, misplaced. Section 152 deals with a situation in which the directors of a corporation have accepted non-cash consideration in exchange for company stock, and there is a dispute raised about whether the non-cash consideration was worth what the directors said it was. To put it more concretely, if a board issued 100 shares of stock to its majority stockholder in exchange for 100,-000 bananas that the board valued at $100,000, § 152 would govern any challenge to the directors' valuation of the bananas.

This issue was settled nearly fifty years ago, by Chancellor Seitz, in *Bennett v. Breuil Petroleum Corp.*[60] In that case, the plaintiff challenged a board's decision to make a *pro rata* offering of shares on the basis that the cash price the offerees were asked to pay was substantially too low. The Chancellor rejected the defendants' argument that § 152 "made the directors' judgment as to the value of the property, etc., received for stock conclusive in the absence of a showing of actual fraud

---

**58.** The fraud claims are pled as individual claims on behalf of Mirror Image's minority stockholders. The two sets of constructive fraud claims are pled derivatively on behalf of Mirror Image.

**59.** 8 *Del. C.* § 152 (emphasis added).

**60.** Del.Ch., 99 A.2d 236, 240 (1953). *See also* ERNEST L. FOLK, III, RODMAN WARD, JR. & EDWARD P. WELCH, FOLK ON THE DE-

LAWARE GENERAL CORPORATION LAW § 152.7, at 152:10–152:11 (2001), (*citing Bennett* for this same proposition); R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 5.13 at 5–25 (2001) (same); D.A. DREXLER, L.S. BLACK, JR., & A.G. SPARKS, III, DELAWARE CORPORATION LAW AND PRACTICE § 17.02 at 17–23 (2001) (same).

..." [61] He said so because § 152 only "deals with the judgment of the directors as to the value of property received for stock. Our case involves the value of stock issued for cash." [62]

■ Given the inapplicability of § 152, Parfi's worries seem overwrought. And even if § 152 did apply, it is not apparent that the pleading of additional counts of constructive and actual fraud would help it out. Our courts have been relatively flexible in implementing § 152's "actual fraud" requirement, and for good reason. The term seems to have little to do with common law fraud, the elements of which involve: (1) a false representation of material fact; (2) made with knowledge that the representation is false; (3) an intention to induce the person to whom it is made to act or refrain from acting in reliance upon it; (4) causing that person, in justifiable reliance upon the statement, to take or refrain from taking action, and (5) damages. [63]

The concept of actual fraud under § 152 has to be read in the context in which it is used. [64] When corporate directors allow the corporation to accept bananas they know to be worth $10,000 on the open market from a majority stockholder in exchange for $100,000 worth of corporate stock, they have *in colloquial terms* committed a "fraud on the corporation" they are entrusted to manage. Even though the transaction itself may not have involved any material false statement or detrimental reliance, the corporation has in

**61.** *Bennett*, 99 A.2d at 240.

**62.** *Id.*

**63.** *Stephenson v. Capano Dev., Inc.*, Del.Supr., 462 A.2d 1069, 1074 (1983). The parties engage in a debate about whether the law of Delaware or Massachusetts governs Parfi's claims for fraud and constructive fraud. Oddly, the defendants argue that Massachusetts law governs claims that arise out of the relationship between fiduciaries of Mirror Image, a Delaware corporation, and its stockholders. In support of that argument, they point to geographic ties to events in this case and the Commonwealth of Massachusetts—even citing events at a stockholder's meeting occurring in that state in support of the application of Massachusetts law. The defendants appear to be motivated by their perception that the substantive law of Massachusetts is somewhat more favorable to them.

Without answering the question conclusively, I am dubious that Massachusetts law governs Parfi's claims. These claims arise of the relationship between the defendants as fiduciaries of a Delaware corporation and the stockholders of that corporation. The internal affairs doctrine would appear to dictate the application of Delaware law. *See McDermott, Inc. v. Lewis*, Del.Supr., 531 A.2d 206, 215 (1987); *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 313, cmt. a (1971).

In this context, it is also illogical to place stress on geography. While the defendants may have chosen to conduct their corporate business geographically in Massachusetts, their choice to serve as fiduciaries of a Delaware corporation is a far more important "tie" in this context, because that signals the law that will govern the relationship the defendants had to the corporation and its stockholders. It makes no commercial sense to think that stockholders consider the place of a corporation's headquarters in evaluating their decision to invest. Instead, stockholders who care (and many do) look to see where the corporation is domiciled because that is the source of the law that will govern its internal affairs.

In any event, I largely rule for the defendants on this aspect of their motion, and the result would be appropriate under either state's law.

**64.** It should also be remembered that § 152 was adopted to deal with a specific constitutional issue arising out of Article IX, § 3 of the Delaware Constitution of 1897, *see* BALOTTI & FINKELSTEIN, *supra*, § 5.13 at 5–23, and not as an overarching provision sweeping to the side the traditional equitable principles of fiduciary duty that otherwise govern self-dealing transactions.

layman's terms been snookered because the directors consummated a transaction on terms they knew to be unfair to the corporation. Put another way, they knew that the non-cash consideration they were causing the corporation to accept was not worth the cash value they impliedly or explicitly placed upon it. As a result, our courts have said that § 152 does not bar a challenge to the directors' judgment on the value of non-cash consideration when an "excessive valuation . . . is so gross as to lead the Court to conclude that it was due, not to an honest error of judgment but to bad faith or a reckless indifference to the rights of others."[65] Furthermore, when § 152 applies, there is authority that suggests that the statutory "actual fraud" provision does not provide a defense when the underlying transaction involves unfair self-dealing proscribed by equitable fiduciary duty concepts.[66]

I provide this overview as a logical predicate to my determination that the complaint does not state claims for fraud or constructive fraud which are in any litigable sense distinguishable from Parfi's breach of fiduciary duty claims. In essence, the complaint alleges that a fraud was committed upon the minority stockholders of Mirror Image and Mirror Image itself because Xcelera and its representatives on the Mirror Image board knew that Xcelera was not paying a fair price. Parfi argues that because Mirror Image and Xcelera consummated and announced these transactions, Mirror Image and Xcelera made an implied representation that the price to be paid was fair. Because this implied representation was false, Parfi asserts that the false representation element of common law fraud is satisfied.

In support of this proposition, Parfi cites no cases but asks me to set a new precedent. I refuse to do so because I see no utility in breaking new ground here. The law of fiduciary duty provides a flexible and plaintiff-friendly remedy for situations when conflicted directors issue additional shares to a majority stockholder for inadequate consideration. To the extent that Parfi can show that the Director Defendants knew that Xcelera was paying too little, they and Xcelera will be liable for a breach of the fiduciary duty of loyalty—a liability exposing them to serious remedies. In view of this reality, it makes no sense for me to hold that every consciously unfair self-dealing transaction involves an implied false representation of fact directed to the corporation or its stockholders, giving rise to a claim for common law fraud. This seems to me to strain the tort of fraud for no useful purpose.

An additional reason exists to dismiss the fraud counts. Parfi fails to plead any detrimental reliance. The complaint does not allege any way in which the minority stockholders relied on the impliedly false representation that the Challenged Transactions were fair. Indeed, the complaint pleads facts (as have Parfi's briefs) indi-

**65.** *Lewis v. Scotten Dillon Co.*, Del.Ch., 306 A.2d 755, 757 (1973); *see also Fidanque v. American Maracaibo Co.*, Del.Ch., 92 A.2d 311, 321 (1952) (same). The flexibility of this approach is further illustrated in *Diamond State Brewery, Inc. v. De La Rigaudiere*, Del. Ch., 17 A.2d 313, 316–17 (1941) (gross overvaluation and partial failure of consideration can lead to a finding of actual fraud).

**66.** *Lofland v. Cahall*, Del.Supr., 118 A. 1, 8 (1922); BALOTTI & FINKELSTEIN, *supra*, § 5.13 at 5–25 & 5–28; *see also Plechner v. Widener College, Inc.*, 418 F.Supp. 1282, 1298 (E.D.Pa.1976) (fact that transaction passes statutory muster under § 152 as not involving actual fraud, does not prevent an equitable inquiry into whether the transaction involved unfair self-dealing by the directors or oppression of minority stockholders), *aff'd*, 569 F.2d 1250 (3d Cir.1977).

cating that the minority stockholders believed the Challenged Transactions to be wrongful at the time they were consummated. And the whole concept of reliance is rather unusual in this context. The Convertible Preferred Stock Offering, of course, did not involve any opportunity for the minority stockholders to purchase anything. Moreover, while the April and July Subscriptions did involve a putative opportunity for the minority stockholders to participate, the only arguable detrimental reliance is that the minority stockholders did not participate because they had not been told that the price for participation was unfairly low to the corporation. Had they been told, so the theory goes, the minority would have joined in the alleged wrongdoing.[67] This strange theory of reliance makes its way into the briefs,[68] but is contradicted by the other parts of the complaint that indicate that the minority stockholders in fact believed the transactions to be unfair from the get-go.[69] With the certainty required for dismissal, one can therefore confidently conclude that the complaint does not plead detrimental reliance with the particularity required to sustain a fraud claim.

Turning to the so-called "constructive fraud" counts, the same logic motivates me, but the oddities of the complaint require a somewhat different remedy. The derivative constructive fraud counts simply reiterate the individual breach of fiduciary duty counts. The concept of constructive fraud is an ill-defined one, but generally exists to prevent wrongdoing by someone who occupies a special position of confidence or trust, such as that of a fiduciary.[70] Our corporate case law has thrown this concept around in a not particularly precise way, but always in a context in which the court is examining whether directors have complied with their fiduciary duties. For example, Chancellor Seitz held that a claim of "constructive fraud" had been pled in a case when it was alleged that corporate stock was being offered on a *pro rata* basis to all stockholders at a "price more than six times less its value." [71] He reasoned that the minority stockholders had the right not to purchase, and should have protection from dilution by the issuance of shares to other stockholders at a price unfair to the corporation. If the minority stockholders could show that the directors had set the price in bad faith or for an improper motive, then the minority stockholders could recover.[72]

◼ I read *Bennett* and the other cases as using the words "constructive fraud" to describe a breach of fiduciary

---

67. In putting it this way, I note the following caveat: If one hundred percent of a corporate stockholder base elects to issue new equity to themselves on a *pro rata* basis for new investments of capital, an argument can be made that price is irrelevant to fairness so long as everyone participates.

68. *See* Pls. Ans. Br. to Mot. of Defs. Xcelera, A. Vik, G. Vik & Fajerson to Dismiss Or Stay In Its Entirety at 21.

69. *See, e.g.,* Compl. ¶¶ 40–51 (April Subscription); ¶ 68 (July Subscription); ¶ 79 (Convertible Preferred Stock Offering); ¶ 85 (Exodus Transaction).

70. 37 AM. JUR. FRAUD AND DECEIT § 8 at 38–39 (2001) (Constructive fraud "arises on a breach of duty by one in a confidential or fiduciary relationship to another that induces justifiable reliance by the other to his or her prejudice"); *see also Italo–Petroleum Corp. of America v. Hannigan,* Del.Supr., 14 A.2d 401, 407–8 (1940) ("Constructive fraud is a breach of legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.").

71. *Bennett,* 99 A.2d at 240.

72. *Id.* at 240–41.

duty, and not as using it as a separate, independent tort.[73] The concept simply captures in more provocative terms the reality that it is a breach of fiduciary duty for directors consciously to transfer corporate assets in exchange for grossly overvalued consideration, particularly when the motivation for the transaction is entrenchment and/or dilution of the minority.

If Parfi can show that the Mirror Image board consciously issued stock to Xcelera for too little value, Parfi will demonstrate a breach of the fiduciary duty of loyalty. To the extent that the same proof can be said to constitute "constructive fraud," it is because that concept is simply a way of analyzing an abuse of a special relationship. For that reason, Parfi should amend the complaint to trans-

form its derivative constructive fraud counts into straightforward breach of fiduciary duty counts. This conversion will not be injurious to Parfi. Fiduciary duty concepts, after all, permit a judgment against Xcelera [74] if it cannot show that the Challenged Transactions are fair, because the Transactions implicate the entire fairness standard. Thus, liability may flow under fiduciary principles without any proof of conscious wrongdoing or bad faith.[75]

### E. *Parfi's Civil Conspiracy Claim Must Be Dismissed*

Nor has Parfi stated a claim for civil conspiracy under Counts V and X of their complaint. Civil conspiracy is not an independent cause of action, but re-

---

**73.** *Id.* at 236; *Lofland v. Cahall,* 118 A. at 8.

**74.** The Vik brothers would also seem to face the same liability problem. Director Fajerson stands in an arguably different, although still uncomfortable, posture.

**75.** The parties also duel over Parfi's attempt to name Mirror Image as more than a nominal defendant to the counts in the complaint. For the reasons already stated, I find that the complaint only states claims for breach of fiduciary duty. Mirror Image cannot be held liable for breaches of fiduciary duty committed by its directors or majority stockholder. *Arnold v. Soc'y for Sav. Bancorp., Inc.,* Del. Supr., 678 A.2d 533, 539-40 (1996); *In re Wheelabrator Techs. Shareholders Litig.,* Del. Ch., C.A. No. 11495, 1992 WL 212595, at *9, Jacobs, V.C. (Sept. 1, 1992). Therefore, the counts in the complaint are dismissed as against Mirror Image, although Mirror Image remains a nominal party because of the derivative nature of several, if not indeed all, of Parfi's claims.

In addition, Mirror Image has also moved to dismiss Parfi's constructive fraud claim directed to the April Subscription on the grounds that a demand was in fact made as to this Transaction. Under Delaware law, the making of a demand has been deemed to be an admission by the proponent that the board

can impartially act on the demand. Because of the litigative importance of that consequence, this court has been careful about labeling communications to boards about corporate transactions as demands unless there is clear and unambiguous evidence supporting the attachment of that label. Specifically, this court will not consider a communication a demand unless it clearly and specifically states: (1) the identity of the alleged wrongdoers; (2) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation; and (3) the legal action shareholder wants the board to take on the corporation's behalf. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, 1994 WL 89019, at *7, Jacobs, V.C. (Mar. 2, 1994). Mirror Image bears the burden to prove that this test has satisfied.

The ambiguous and confusing communication to the Mirror Image board that is contended to be a demand does not meet the second and third prongs of this test for several reasons, including (i) the absence of any reference to unfair price or any demand for the board to cause Mirror Image to file suit against Xcelera or any director, (ii) the communication's apparent focus on the possibility that Parfi might bring *direct* claims regarding the April Subscription, and (iii) the communication's confusing intermingling of a discussion of the April Subscription and a books and records demand.

quires proof of underlying wrong that would be actionable absent conspiracy.[76] It requires the combination of two or more persons for an unlawful purpose or for the accomplishment of a lawful purpose by unlawful means, and resulting damages.[77]

■ Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort. As such, it can be viewed as parallel to aiding and abetting. Indeed, in *In re Lukens Inc. Shareholders Litigation*, Vice Chancellor Lamb cited the elements of civil conspiracy as being the very same elements required to set forth a case of aiding and abetting.[78] Because there already exist direct claims for breach of fiduciary duty against the Director Defendants and Xcelera, there are no parties over whom this court needs to cast an imputational net. For this reason, plaintiffs' civil conspiracy claims (Counts V and X) are therefore dismissed.

### F. The Complaint Does Not State Claims for Breach of Implied Contract Or Tortious Interference With Contract

Parfi also asserts two claims based on a purported implied contract between the minority stockholders and Xcelera. It alleges that Xcelera's "course of conduct," as manifested by the April 1999 and July 1999 Subscriptions, led to the creation of an implied contract that future stock offerings of Mirror Image would be made available to all shareholders on equal and identical terms.[79] By failing to allow the minority stockholders to participate in the Convertible Stock Offering, Parfi contends, Xcelera breached that implied contract. They further argue that because the Director Defendants were aware of this implied contract, and "knowingly caused [Xcelera] not to honor its contractual obligations," the Director Defendants tortiously interfered with that implied contract.[80]

■ To determine if such an implied contract existed I must, of course, find sufficient conduct by the parties to infer an intent between Xcelera and the minority stockholders to enter such an agreement. "A contract will be implied in fact only when the Court may fairly infer such an intent from the evidence; it represents the presumed intention of the parties as indicated by their conduct." [81]

■ To support its implied contract claim, Parfi has asserted that Xcelera's "course of conduct," as manifested in its behavior in connection with the first two Subscriptions, created such a contract. If anything, the facts Parfi has alleged suggest a contrary conclusion. For instance, Parfi pleads that the April Subscription

**76.** *Nutt v. A.C. & S. Co., Inc.,* Del.Super., 517 A.2d 690, 694 (1986); *see also Phoenix Canada Oil Co. v. Texaco, Inc.,* 560 F.Supp. 1372, 1388 (D.Del.1983).

**77.** *Weinberger v. UOP, Inc.,* Del.Ch., 426 A.2d 1333, 1348 (1981), *rev'd on other grounds,* Del.Supr., 457 A.2d 701 (1983); *see also Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1057 (1984).

**78.** Del.Ch., 757 A.2d 720, 734–35 (1999), *citing Gilbert v. El Paso, supra* at 1057.

**79.** Compl. ¶¶ 160–61.

**80.** *Id.* ¶ 170.

**81.** *Creditors' Comm. of Essex Builders, Inc. v. Farmers Bank,* Del.Supr., 251 A.2d 546, 548 (1969); *see also Trincia v. Testardi,* Del.Ch., 57 A.2d 638, 641 (1948) (an implied agreement is arrived at by acts; the difference between the implied and express contracts is only in the evidence by which they are proved); 17A AM.JUR.2d § 13 ("An implied contract between two parties is raised only when the facts are such that an intent may fairly be inferred on their part to make such a contract.").

was structured so that for all practical purposes, the minority stockholders could not participate; to wit, Parfi has contended that the resolution authorizing the Subscription was so vague that it "failed to identify all shareholders who were entitled to subscribe";[82] that the payment deadlines were unfairly harsh; and that the minority stockholders' requests for additional information concerning the need for additional capital consistently were refused.

In addition, the pled facts about the Director Defendants' behavior in connection with the July Subscription even more strongly suggest that there was no implied contract that all shareholders would have equal access to offerings of Mirror Image shares. For example, Parfi alleges that because of a first-come, first-served provision in that Subscription, the entire transaction was a "sham" in the sense that Xcelera had already subscribed to the entire Subscription.[83]

Because Parfi has failed to plead facts supporting the existence of an implied contract, I hereby dismiss Counts XI and XII of its complaint alleging breach of implied contract and tortious interference with contract, respectively.

### III. *Conclusion*

For the foregoing reasons, summary judgment is granted for defendants and the complaint is dismissed in its entirety because all the claims are arbitrable. In the alternative, I:(a) dismiss the fraud, civil conspiracy, and implied contract claims (Counts III, V, VIII, X, XI, XII, and XIII) for failure to state a claim for which relief may be granted; (b) require that the derivative constructive fraud claims (Counts IV, IX, and XIV) be amended and re-alleged as claims for breaches of fiduciary

duty; and (c) otherwise reject the arguments made in defendants' motions to dismiss. The defendants shall submit a conforming final order, approved as to form, within seven days.