Cement Masons Local 780 Pension Fund, Plaintiff,

against
Leonard Schleifer, George Yancopoulos, Charles Baker, Arthur Ryan, Eric Shooter, George Sing, Marc Tessier-Lavigne, Michael Brown, Robert Ingram, Alfred Gilman, Joseph Goldstein, Christine Poon, P. Roy Vagelos, Regeneron Pharmaceuticals, Inc., Defendants.


654453/2015

Saliann Scarpulla, J.

In this stockholders' derivative action concerning, among other things, alleged breach of fiduciary duty, defendants Leonard S. Schleifer ("Schleifer"), George D. Yancopoulos ("Yancopoulos"), Charles A. Baker ("Baker"), Arthur F. Ryan ("Ryan"), Eric M. Shooter ("Shooter"), George L. Sing ("Sing"), Marc Tessier-Lavigne ("Tessier-Lavigne"), Michael S. Brown ("Brown"), Robert A. Ingram ("Ingram"), Alfred G. Gilman ("Gilman"), Joseph L. Goldstein ("Goldstein"), Christine A. Poon ("Poon"), P. Roy Vagelos ("Vagelos") (collectively the "Director Defendants") and nominal defendant, Regeneron Pharmaceuticals, Inc. ("Regeneron") move to dismiss the complaint, pursuant to CPLR 3211 (a) (1), (3) and (7), New York Civil Practice Law 3016 (b), and New York Business Corporation Law Sections 505, 626, and 713.
Plaintiff Cement Masons Local 780 ("Cement Masons") is a stockholder in Regeneron, a New York corporation. Regeneron is "a fully integrated biopharmaceutical company that discovers, invents, develops, manufactures, and commercializes medicines for the treatment of serious medical conditions."
Three of the Director Defendants are former directors: Shooter was a director until he [*2]retired on April 4, 2014; Ingram resigned from Regeneron's board in November 2015; and Gilman died on December 23, 2015. Further, three of the Director Defendants are Management Director Defendants  Dr. Leonard Schleifer, Regeneron's CEO; Dr. George Yancopoulos, Regeneron's CSO and President of Regeneron Laboratories; and Dr. Roy Vagelos, Regeneron's Chairman.
The Board's compensation committee (the "Compensation Committee") was comprised of Tessier-Lavigne, Baker, Goldstein, Ingram, Poon and Sing, and was responsible for setting the compensation amounts for Regeneron's directors and named employees. It also decided how many options Vagelos received annually following a recommendation from Regeneron. As per Regeneron's 2015 Proxy Statement, only nine of the thirteen current and former directors meet the Nasdaq "independence" requirements.
Equity awards are made pursuant to Regeneron's incentive plans. The 2000 Long-Term Incentive Plan (the "2000 Plan"), in section 4, provides that:
The Committee shall have the authority in its sole discretion, subject to and not inconsistent with the express provisions of the Plan, to administer the Plan and to exercise all the powers and authorities either specifically granted to it under the Plan or necessary or advisable in the administration of the Plan, including, without limitation, the authority to grant Awards; to determine the persons to whom and the time or times at which Awards shall be granted; to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate and the terms, conditions, restrictions and performance criteria relating to any Award; to determine whether, to what extent, and under what circumstances an Award may be settled, canceled, forfeited, exchanged, or surrendered; to make adjustments in the performance goals in recognition of unusual or nonrecurring events affecting the Company or the financial statements.
Regeneron's 2014 Long-Term Incentive Plan (the "2014 Plan"), section 4, states that:
The Plan shall be administered by the Committee. The Committee shall have the authority in its sole discretion, subject to and not inconsistent with the express provisions of the Plan, to administer the Plan and to exercise all the powers and authorities either specifically granted to it under the Plan or necessary or advisable in the administration of the Plan, including, without limitation, the authority to grant Awards; to determine the persons to whom and the time or times at which Awards shall be granted; to determine the type and number of Awards to be granted, the number of shares of Stock to which an Award may relate and the terms, conditions, restrictions and performance criteria relating to any Award; to determine whether, to what extent and under what circumstances an Award may be settled, canceled, forfeited, exchanged or surrendered; to make adjustments in the performance goals in recognition of unusual or nonrecurring events affecting the Company or the financial statements of the Company (to the extent not inconsistent with Section 162(m) of the Code, if applicable), or in response to changes in applicable laws, regulations or accounting principles; to construe and interpret the Plan and any Award; to prescribe, amend and rescind rules and regulations relating to the Plan; to determine the terms and provisions of Agreements; and to make all other determinations deemed necessary or advisable for the administration of the Plan.
The Compensation Committee's only restrictions regarding the setting of equity compensation for Regeneron's directors are that the incentive plans limit the total shares available for issue at one million shares per individual and the total number of nonqualified stock options available to issue to non-employee directors. The incentive plans provide that non-employee directors may receive awards other than nonqualified stock options.
The following facts are taken from Cement Masons' complaint. Cement Masons contend that, beginning in 2013, the Director Defendants awarded themselves increasingly excessive compensation despite Regeneron's declining financial results. In 2012, Regeneron reported net income of $750.2 million and earnings per share of $7.92. In 2013, Regeneron's net income declined by 43% to $424.3 million and earnings per share declined by 45% to $4.33. Then, in 2014, Regeneron's net income dropped to $348.07 million and earnings per share to $3.46.
For 2013, the Compensation Committee awarded the employee Director Defendants the following compensation: 1) Schleifer  $36,272,665; 2) Yancopoulos  $31,017,593; and Vagelos  $17,818,000.[FN1]
Cement Masons allege that in 2013 defendant Schleifer was the thirteenth highest paid CEO in the United States. According to Regeneron's 2014 proxy statement, the compensation awards for the Regeneron Director Defendants was significantly higher in comparison to fourteen Regeneron-selected peer companies. For example, the average CEO in the peer companies made $14,798,281 in 2013, while defendant Schleifer made $36,272,665 — almost two and a half times his peers. And, while the average second-highest paid executive in Regeneron's designated peer group made $5,306,969 in 2013, defendant Yancopoulos made almost six times that, or $31,017,593. 
Cement Masons claim that, in 2013, Regeneron's non-employee Director Defendants were the highest compensated non-employee directors in the United States and were compensated at much higher levels than Regeneron's peer companies. In 2013, the Compensation Committee awarded $1,423,763 to defendant Sing, $1,420,763 to defendants Brown and Ryan, $1,408,763 to defendant Shooter, and $1,418,763 to the remaining non-employee Director Defendants.
In its proxy statements, Regeneron notes: "We use Peer Group data as a point of reference for measurement, but Peer Group data do not represent the only factor considered and there is no targeted pay level percentile. The Compensation Committee retains discretion in determining the nature and extent of the use of Peer Group data."
Vagelos receives compensation as a "part-time employee" and his compensation is not dependent on performance. Since 2011, Vagelos has received ten times as much equity compensation as the non-employee directors. Cement Masons argue that "by awarding themselves extraordinary director compensation, and tying Defendant Vagelos's compensation directly to these awards, the Committee awarded Defendant Vagelos compensation that is unfair and extraordinary."
In 2014, Regeneron sought shareholders' approval for a new compensation plan. Regeneron's proxy statements informed shareholders that "Class A stock is entitled to ten votes [*3]per share and the common stock is entitled to one vote per share." The 2014 Plan permitted the Compensation Committee to provide equity awards of 16,456,631 million shares (4,456,631 of which would roll from the 2000 Plan into the new plan) to executives, directors, employees and consultants. Unlike the 2000 Plan, which limited nonemployee directors to their "automatic award" of stock options, the 2014 Plan granted the Compensation Committee "sole and absolute discretion" to grant themselves and other non-employee directors any amount of "Nonqualified Stock Options" in addition to the "automatic awards." 
Although the Board of Directors "unanimously" recommended approving the 2014 Plan, two proxy advisors, Institutional Shareholder Services ("ISS") and Glass Lewis ("Glass"), advised shareholders to vote against the 2014 Plan. The results of the vote were: 65,053,023 votes "for" the 2014 Plan and 40,855,936 votes "against" it.
In addition to their own shares, the Board also controlled the voting rights of the 20,018,090 Regeneron common shares held by nonparty shareholders Sanofi, Sanofi-Aventis US, LLC, Aventis Pharmaceuticals Inc., and Sanofi-Aventis Amérique Du Nord (collectively "Sanofi") pursuant to an Amended and Restated Investor Agreement" (the "Sanofi Agreement").[FN2]
Because the 2014 Plan was deemed consistent with Regeneron's "historical equity compensation practices," Sanofi was required to vote its shares as recommended by the Board. Cement Masons allege that if the Defendants' Class A Shares and Common Shares and Sanofi's Common Shares are subtracted from the "for" vote total then the number of "for" votes is reduced from 65,053,023 to 24,272,896. Cement Masons states that the latter number represents the number of disinterested shareholders voting in favor of the 2014 Plan, which is far less than the number of shareholders against the plan. 
Cement Masons contend that despite its calculation that disinterested shareholders voted against the 2014 Plan, the Director Defendants awarded themselves even greater compensation under the 2014 Plan. As before, such compensation was excessive in comparison to the peer companies' compensation amounts. In 2014, the Compensation Committee awarded the employee Director Defendants the following compensation: 1) Schleifer  $41,965,424; 2) Yancopoulos  $35,506,811; and Vagelos  $20,514,945. For that same year, the Compensation Committee awarded the non-employee Director Defendants as follows: $2,862,525 to Ingram; $1,774,032 to Sing; $1,769,032 to Brown, Gilman, Goldstein and Ryan; $1,764,032 to Baker, Tessier-Lavigne and Poon; and $1,721,532 to Shooter. Even though the Compensation Committee awarded each non-employee director 10,838 shares of common stock instead of the 12,750 shares that the 2014 Plan automatically grants, Regeneron's non-employee directors were [*4]still the highest compensated in the United States in 2014.
The Cement Masons argue that disinterested shareholders, like itself, are "powerless to check the selfish actions of Defendants." Cement Masons therefore commenced this derivative action without first making a demand on the Board. Cement Masons contend that all the Director Defendants (ten of whom comprise the Board at the time of the allegations) are interested and therefore demand was excused. 
On this motion, Defendants argue that the complaint must be dismissed because Cement Masons failed to comply with the requirements of Business Corporation Law § 626 [c], in that it failed to allege with particularity the reasons for its failure to make a demand upon Regeneron's board "insofar as it challenges the management directors' compensation." The Defendants further argue that, pursuant to BCL § 505(h), the Director Defendants' business judgment is conclusive on the compensation issue as a matter of law because Regeneron has not alleged that the Director Defendants acted fraudulently in setting compensation. Defendants also argue that Regeneron's claims are insufficient pursuant to BCL § 713(e), because Regeneron has failed to allege facts showing that the Director Defendants committed waste. Finally, defendants argue that Regeneron's claims should be dismissed because the Regeneron shareholders ratified the compensation plan.
Discussion
On a motion to dismiss pursuant to CPLR 3211 (a), the court must "accept the facts alleged in the complaint as true, accord plaintiff[] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." Leon v. Martinez, 84 NY2d 83, 87-88 (1994); Cabrera v. Collazo, 115 AD3d 147, 150-151 (1st Dept. 2014). However, under CPLR 3211(a)(3), a complaint must be dismissed where the plaintiff lacks the legal capacity to sue. See Omansky v. Lapidus & Smith, L.L.P., 273 AD2d 110, 111 (1st Dept. 2000) (dismissing causes of action because individual plaintiffs lacked authority to sue on partnership's behalf).
1. Demand Futility Under BCL § 626(c)
Under New York Business Corporation Law § 626(c), the complaint in a shareholders' derivative suit must "set forth with particularity" the plaintiff's efforts to secure the action's initiation by the board or "the reasons for not making such effort." Cement Masons allege that demand upon the Board to initiate this action was excused because it would have been futile. To withstand a motion to dismiss based on failure to adequately plead demand futility, a complaint needs to allege "with particularity that (1) a majority of directors are interested in the transaction; or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction; or (3) the directors failed to exercise their business judgment in approving the transaction." Marx v. Akers, 88 NY2d 189, 198 (1996). If a plaintiff sufficiently establishes any of these three prongs, then demand is excused. Id. at 200-201.
A. Executive Compensation Claims (pre-2014 Plan)
Cement Masons challenge the pre-2014 executive compensation of Schleifer, Yancopoulos and Vagelos as excessive and not in keeping with peer companies' executive salaries. Cement Masons argue that a majority of the Board members are interested in executive compensation because they face "a substantial likelihood of liability" as a result of approving the excessive compensation. 
With regard to the first prong of Marx, Cement Masons' complaint falls short of alleging that a majority of directors were interested in the pre-2014 Plan decisions concerning executive compensation because only three of the ten Board members were alleged to have received the excessive executive compensation.
Cement Masons' attempt to establish demand excusal under the second Marx prong also falls short. Cement Masons conclusorily alleges that, as to the pre-2014 executive compensation awards, the directors "failed to inform themselves to a degree reasonably necessary" about the awards. In fact, the allegation that the Board failed properly to inform itself prior to setting executive compensation is belied by other allegations in the complaint that the Compensation Committee reviewed peer group compensation levels and provided explanations for its high executive compensation amounts.
Lastly, for demand to be excused under the third Marx prong, a plaintiff must allege facts "such as self-dealing, fraud or bad faith that would establish that the [transaction] could not have been the product of sound business judgment." Goldstein v. Bass, 138 AD3d 556, 557 (1st Dept. 2016). Only in "rare cases" will a board's action be deemed "egregious" enough to satisfy the third test of Marx. Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg, 60 AD3d 77, 82 (1st Dept. 2009). Here, affording the complaint the benefit of every favorable inference, Cement Masons does not sufficiently allege that the directors failed to exercise their business judgment in approving the executive compensation. Again, only three members of the Board benefitted from the (pre-2014 Plan) executive compensation awards. Accordingly, demand was not excused and the failure to make a demand on the Board requires a dismissal of the pre-2014 executive compensation claims. 
B. Adoption of the 2014 Plan
Cement Masons contend that as to director compensation under the 2014 Plan, half of the ten-member Board (the five Compensation Committee members) had a financial interest in the compensation they awarded themselves and the other directors. Cement Masons also allege that demand was futile as to the executive compensation claims because all Regeneron compensation — both director and executive — was awarded pursuant to the 2014 Plan, which the Board "forced" Regeneron to accept over the disinterested stockholders' objections.
Five of the ten-member Regeneron Board were members of the Compensation Committee and possessed the authority to set equity award amounts for themselves (and the other directors) and to decide equity compensation for Regeneron employees and were therefore interested in the 2014 Plan and director compensation awards. See Bansbach v. Zinn, 1 NY3d 1, 12 (2003) (stating that "in Marx self-interest was shown by allegations that the outside directors comprised a majority of the board and therefore received a personal benefit in fixing their own excessive compensation.") For this reason, I deem that demand was futile, under the first Marx prong, for Cement Masons' claims pertaining to the adoption of the 2014 Plan and any compensation awards under it.
2. The Business Judgment Rule & Stock Option Grants
Defendants next argue that BCL § 505(h) mandates dismissal of all of Cement Masons' claims because, under that statute, the Board's judgment as to the value received for the stock [*5]option grants to Regeneron's directors is conclusive.[FN3] BCL § 505(h) states that "[i]n the absence of fraud in the transaction, the judgment of the board shall be conclusive as to the adequacy of the consideration, tangible or intangible, received or to be received by the corporation for the issue of rights or options for the purchase from the corporation of its shares." 
Cement Masons argue in opposition that, although there is no New York case law applying BCL § 505(h) to self-interested transactions, there is Delaware law applying its analogous statutes[FN4] and the Delaware courts have concluded that "the statutory 'actual fraud' provision does not provide a defense when the underlying transaction involves unfair self-dealing proscribed by equitable fiduciary concepts." Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1234-35 (Del. Ch. 2001), rev'd on other grounds, 817 A.2d 149 (Del. 2002).
New York courts have previously noted, in some contexts, that the business judgment rule is not an absolute protection for all board decisions. See, e.g., Barbour v. Knecht, 296 AD2d 218, 224 (1st Dept. 2002) ("The business judgment rule is not an insuperable barrier, however, and 'permits review of improper decisions '"); Amfesco Industries, Inc. v. Greenblatt, 172 AD2d 261, 264 (1st Dept. 1991) ("where, as here, the complaint alleges that the corporate decisions of the directors lacked a legitimate business purpose or were tainted by a conflict of interest, bad faith or fraud, the business judgment rule may not be invoked to insulate the directors."). Absent a controlling New York precedent in the context of BCL § 505(h) and self-interested transactions, I follow Delaware's case law and find that BCL § 505(h) does not shield the Director Defendants' judgment in this self-interested transaction as a matter of law. 
3. Shareholder Ratification
The Defendants next argue that the Director Defendants' judgment is shielded by Regeneron's stockholders' votes in favor of the 2014 Plan. Contrary to Defendants' position, BCL § 713(a)(2) doesn't permit interested shareholder ratification to insulate it from judicial scrutiny.
BCL § 713(a)(2) states that "[n]o contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone " New York's BCL § 713(a)(2) requires the transaction to be "approved by vote of such shareholders" and is similar to Delaware's DGCL § 144(a)(2) which requires that the transaction be "specifically approved in good faith by vote of the stockholders." 
The Delaware courts interpreting DGCL § 144(a)(2) have concluded that it provides that only disinterested shareholders' votes may be considered. See In re Cox Commc'ns, Inc. S'holders Litig., 879 A.2d 604, 615 n.19 (Del. Ch. 2005) ("The reference to the approval of stockholders being made in 'good faith' in § 144(b)(2) might be read as imposing a requirement [*6]on an interested party to the transaction that its approving vote as a stockholder to refrain from using its voting power to push through a transaction unfair to the corporation and correspondingly overgenerous to the interested party."). 
Defendants argue that Sanofi is an independent and disinterested shareholder.[FN5]
However, Cement Masons alleges that the Sanofi Agreement — which required Sanofi, a 20% stockholder, to vote as recommended by the Board unless the 2014 Plan departed from Regeneron's "equity compensation historical practices" — enabled the Board to control Sanofi's voting rights with respect to the 2014 Plan. In other words, the Sanofi Agreement provided that the interested Board simply had to determine that the 2014 Plan was in keeping with its historical compensation awards in order to trigger Sanofi's obligation to vote in favor of the plan. 
Additionally, the Sanofi Agreement was reached after the proxy advisors, ISS and Glass advised shareholders to vote against the 2014 Plan. Thus, by the Board's unanimous recommendation that the 2014 Plan be adopted, and its representation that the plan did not deviate from Regeneron's already extremely high rates of compensation, Sanofi was bound by the Sanofi Agreement to vote in favor of it. Under these circumstances, I cannot conclude as a matter of law that Sanofi was disinterested. Thus, Cement Masons has sufficiently alleged that the 2014 Plan was not approved by disinterested stockholders.[FN6]

Moreover, Delaware courts have found that in situations involving self-dealing transactions under a stock plan, even if the stockholders approved the stock incentive plan, the defendant directors cannot shield themselves with the business judgment rule where the plan lacks sufficient definition. Seinfeld v. Slager, 2012 WL 2501105 (Del. Ch. June 29, 2012). In Seinfeld v. Slager the court held that, "[i]f a board is free to use its absolute discretion under even a stockholder-approved plan, with little guidance as to the total pay that can be awarded, a board will ultimately have to show that the transaction is entirely fair." Id. at *12, 16 (holding that the plaintiff's claim challenging the board's "self-interested decision to award bonuses to [b]oard members must be evaluated for entire fairness" and therefore survives the defendants' motion to dismiss). 
Unlike the 2000 Plan, which limited nonemployee directors to their "automatic award" of stock options, the 2014 Plan granted the Compensation Committee "sole and absolute discretion" to grant themselves and other non-employee directors any amount of "Nonqualified Stock Options" in addition to the "automatic awards." Even though Regeneron's stockholders [*7]approved the 2014 Plan, there were no "meaningful" limits imposed on the board with respect to the awarding of compensation. Thus, the business judgment rule is inapplicable and the board's compensation decisions must be evaluated under the entire fairness standard. See, Seinfeld v. Slager, 2012 WL 2501105; Calma on Behalf of Citrix Systems, Inc. v. Templeton, 114 A.3d 563, 588 (Del. Ch. 2015) (holding that because the company plan lacked any "ceilings" on the directors' compensation, the "[d]efendants have not carried their burden to establish a ratification affirmative defense at this procedural stage because Citrix stockholders were never asked to approve — and thus did not approve — any action bearing specifically on the magnitude of compensation for the Company's non-employee directors."). 
Because neither the Board nor Sanofi can be deemed disinterested stockholders as a matter of law, Defendants are not entitled to dismissal of the claims in connection with the 2014 Plan under the shareholder ratification provision of BCL § 713(a)(2).
4. Excessive Compensation Claims
Lastly, the Defendants argue that all claims must be dismissed under BCL § 713(e). BCL § 713(e) states that "[u]nless otherwise provided in the certificate of incorporation or the by-laws, the board shall have authority to fix the compensation of directors for services in any capacity."
Defendants incorrectly cite Marx for the proposition that in order to "avoid" BCL § 713(e), Cement Masons' challenge to director compensation must include allegations of facts establishing "wrongdoing or waste." Marx held that "a complaint challenging the excessiveness of director compensation must — to survive a dismissal motion — allege compensation rates excessive on their face or other facts which call into question whether the compensation was fair to the corporation when approved, the good faith of the directors setting those rates, or that the decision to set the compensation could not have been a product of valid business judgment." Marx, 88 NY2d at 203-204. Marx clarified that "[p]laintiffs must prove wrongdoing or waste as to compensation arrangements regarding disinterested directors or shareholders, but directors who approve their own compensation bear the burden of proving that the transaction was fair to the corporation." Id. at 204 n. 6.
As this case involves interested directors and shareholders, Cement Masons need not allege waste. In addition, the complaint's detailed allegations pertaining to its excessive compensation claims "call into question whether the compensation was fair to the corporation when approved" and are sufficient under Marx.
5. Breach of Fiduciary Duty
To state a claim for breach of fiduciary duty, a complaint must allege: (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages. Burry v. Madison Park Owner LLC, 84 AD3d 699, 700 (1st Dept. 2011). Causes of action for breach of fiduciary duty "'must be pleaded with the particularity required by CPLR 3016 [b].'" Armentano v. Paraco Gas Corp., 90 AD3d 683, 684 (2d Dept. 2011). And, "corporate officers and directors have a fiduciary relationship with the shareholders of their corporation." Lindner Fund, Inc. v. Waldbaum, Inc., 82 NY2d 219, 223 (1993).
In a going-private merger case, the New York Court of Appeals adopted the standard of review enunciated by the Delaware Supreme Court [FN7]
in determining the appropriate standard for a [*8]breach of fiduciary duty claim involving a shareholder vote. See Matter of Kenneth Cole Prods., Inc., Shareholder Litigation, 27 NY3d 268, 278 (2016). In Kenneth Cole, the Court of Appeals held that the Delaware standard properly balanced minority shareholders' right "to obtain judicial review of transactions involving interested parties, and to proceed to trial where there is adequate proof that those interests may have affected the transaction" against directors' and controlling shareholders' interests "in avoiding frivolous litigation and protecting independently-made business decisions from unwarranted judicial intervention." Id. In interpreting this rule, the court found that "a complaint is sufficient to state a cause of action for breach of fiduciary duty — and the plaintiff may proceed to discovery — if it alleges 'a reasonably conceivable set of facts' showing that any of the six enumerated shareholder-protective conditions did not exist."[FN8]
 Id. (citation omitted). 
Defendants' argue that the Kenneth Cole rule cannot be applied in the context of a shareholder-approved compensation plan. Here, Cement Masons allege that the Defendants acted in their own self-interest rather than for the benefit of Regeneron in promulgating the 2014 Plan. See, e.g. Limmer v. Medallion Group, Inc., 75 AD2d 299, 303 (1st Dept. 1980) (finding that a self-dealing transaction is a transaction in which a corporate director violates the duty of loyalty to the corporation by acting for his or her own personal benefit rather than the corporation's benefit). The complaint sufficiently details how the Defendants' reaped tremendous personal gain through the 2014 Plan. And, the complaint alleges that the shareholder vote approving the plan was not disinterested. Accordingly, I find that the claim for breach of fiduciary duty has been adequately pled at this pre-answer motion to dismiss stage. 
6. Unjust Enrichment
A cause of action for unjust enrichment requires a showing that: (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff. Georgia Malone & Co. Inc. v. Ralph Rieder, 86 AD3d 406, 408 (1st Dept. 2011).
Cement Masons allege that Defendants "have been unjustly enriched by abusing their [*9]ability to set their own compensation as Regeneron directors and paying themselves excessive compensation" at the expense of Regeneron. These allegations sufficiently state a claim for unjust enrichment.
In accordance with the foregoing, it is
ORDERED that the motion by Defendants to dismiss Plaintiff's complaint is granted with respect to its pre-2014 executive compensation claims; and it is further
ORDERED that the motion by Defendants to dismiss Plaintiff's complaint is denied with respect to the claims arising out of 2014 Plan; and it is further
ORDERED that counsel are directed to appear for a status conference at 60 Centre Street, Room 208 on August 16, 2017 at 2:15pm.
This constitutes the decision and order of the Court.
Dated: June 28, 2017
Hon. Saliann Scarpulla
JSC



Footnotes

Footnote 1:The complaint states that the Compensation Committee conferred additional compensation on Regeneron's highest-paid employees, such as paying for Schleifer's $18,000 annual golf membership (through 2015) and paying for tax planning for Schleifer and Yancopoulos.

Footnote 2: According to the 2014 Regeneron proxy statement, "In January 2014, we entered into an Amended and Restated Investor Agreement with Sanofi. Pursuant to the agreement, Sanofi has agreed to vote its shares as recommended by our board of directors, except that it may elect to vote proportionally with the votes cast by all of our other shareholders with respect to certain change-of-control transactions and to vote in its sole discretion with respect to liquidation or dissolution of our company, stock issuances equal to or exceeding 20% of the then outstanding shares or voting rights of common stock and Class A stock - 31 - (taken together), and new equity compensation plans or amendments if not materially consistent with our historical equity compensation practices."
Footnote 3:Defendants cite Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp., 94 NY2d 426, 429 (2000) for its interpretation of BCL § 505(h) but, unlike here, Pinnacle involved a disinterested board's approval of warrants and is therefore distinguishable.

Footnote 4:Delaware General Corporation Law ("DGCL") § 157(b) and § 152(b). 

Footnote 5:At oral argument, in response to questioning about what Sanofi received in exchange for its agreement to vote as recommended by the Board, defense counsel stated that as part of the Sanofi Agreement, Sanofi "agreed to continue funding research and they got a share of the upside of drugs."
Footnote 6:As discussed above, if the Defendants' Class A Shares and Common Shares and Sanofi's Common Shares are subtracted from the "for" vote total then the number of votes "for" the 2014 Plan is reduced from 65,053,023 to 24,272,896. The 24,272,896 "for" votes is significantly less than the 40,855,936 votes "against" the 2014 Plan.

Footnote 7:In Kahn v. M & F Worldwide Corp., the Delaware court held that "where the merger is conditioned ab initio upon the approval of both an independent, adequately-empowered Special Committee that fulfills its duty of care, and the uncoerced, informed vote of a majority of the minority stockholders," and "[w]here a transaction involving self-dealing by a controlling stockholder is challenged, the applicable standard of judicial review is "entire fairness," with the defendants having the burden of persuasion." Kahn v. M & F Worldwide Corp., 88 A.3d 635, 642 (Del. 2014).
Footnote 8:"[I]n controller buyouts, the business judgment standard of review will be applied if and only if: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority." Kahn, 88 A.3d at 645.